# Exhibit B

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

JOSE ORTIZ,

      Plaintiff,                    Case No. _____

v                                  Hon. _____

ROBERT NELMS,

      Defendant.

---

## **COMPLAINT**

Plaintiff, Jose Ortiz ("Ortiz"), through his counsel Varnum LLP, hereby states as his Complaint against Defendant Robert Nelms ("Nelms") as follows:

## **NATURE OF ACTION**

1.      This is a suit for breach of contract, intentional misrepresentation/fraud, common law conversion, statutory conversion, embezzlement, breach of fiduciary duty, fraud or deceit in the sale of security in violation of Section 10(B) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78J, and Rule 10B-5, 17 CFR § 240.10B-5, fraud or deceit in the sale of security in violation of the Uniform Securities Act, MCL § 421.2501, and sale of unregistered securities in violation of the Uniform Securities Act, MCL § 451.2301, resulting from Nelms' offer and sale of unregistered securities and theft of Ortiz's investment funds.

## **PARTIES AND JURISDICTION**

2.      Plaintiff Jose Ortiz is an individual and a citizen of the State of Michigan.

3.      Defendant Robert Nelms is an individual who, upon information and belief, is a citizen of the State of South Carolina.

4.      The amount in controversy exceeds $75,000.00, exclusive of interest, costs and attorneys' fees.

5.      Subject matter jurisdiction exists in this Court because the parties are diverse and the matter in controversy exceeds $75,000.  *See Safeco Ins. Co. of Am. v. City of White House, Tenn.*, 36 F.3d 540, 545 (6th Cir. 1994); 28 U.S.C. § 1332(a); 28 U.S.C. § 1332(c)(1).  The district courts have original jurisdiction over all civil actions arising under the Constitution, laws or treaties of the United States. 28 U.S.C. §1331.

6.      This Court also has personal jurisdiction over Defendant Robert Nelms because a substantial portion of the wrongdoing alleged in this Complaint took place in the State of Michigan.

## VENUE

7.      A civil action may be brought in a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located, a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred or in a judicial district in which a substantial part of the property that is the subject of the action is situated.  28 U.S.C. §1391(b).

8.      A substantial part of the events or omissions giving rise to the claim occurred in the Western District of Michigan.

9.      This case involves the theft of Ortiz's money located within the Western District of Michigan.

10.      Furthermore, this case involves the offer and sale of unregistered securities within the Western District of Michigan.

11.      Venue is appropriate in the Western District of Michigan.

## GENERAL ALLEGATIONS

12.     Ortiz hereby incorporates by reference the allegations contained in the preceding paragraphs.

13.     In 2015, Nelms, using the name "Ian" and posing as an investment advisor, came to Ortiz with an alleged investment opportunity.

14.     At the time, both Nelms and Ortiz were living in Michigan.

15.     Nelms offered and sold Ortiz investment contract securities in Michigan for MGMC, LP.  See Subscription Agreement, **Exhibit 1**; MGMC, LP Private Offering, **Exhibit 2**.

16.     Subsequently, Nelms advised Ortiz to transfer his retirement savings into an IRA self-directed account with Advanta Trust, 13191 Starkey Rd. Suite 2 Largo, FL 33773.

17.     Nelms explained that if Ortiz transferred his savings into the IRA self-directed account, Nelms could then control when and where to move the money around as Ortiz's investment manager.

18.     Additionally, Nelms promised Ortiz a 17-percent return on his investment.

19.     Based on Nelms' representations, Ortiz invested his retirement savings of over $235,000 with Nelms.

20.     Subsequently, Ortiz grew concerned about Nelms' investment practices, as he had not received any statements regarding his accounts or reports on earnings or losses from Nelms.

21.     When Ortiz confronted Nelms about the status of his investments, Nelms explained to Ortiz that he had allegedly invested the funds in forest land in Virginia.

22.     Ortiz requested proof of such investment and Nelms assured him that he would be sending a written proposal prepared by an unnamed timber company shortly.

23.     Nelms never provided such documentation.

24.     Later, to his shock, Ortiz discovered that Nelms had absconded from Michigan with his funds.

25.     Not only that, but Ortiz learned that Nelms had been serving as a so-called "investment advisor" under a false name and that he was a convicted criminal with an extensive history of theft and securities fraud.

26.     Much of the information Nelms presented in the Subscription Agreement and the MGMC, LP Private Offering proved to be fabricated.

27.     Nelms signed the Subscription Agreement using the name Ian, while his first name is in fact Robert.  See **Exhibit** 1.

28.     Furthermore, upon information and belief, Q-Consolidated, Inc. and/or Q-Consolidated, LLC, the purported General Partner of MGMC, LP, is a fictitious entity.

29.     Nelms represented that this entity was incorporated in the State of Texas; however, no records exist for such entities.

30.     Additionally, upon information and belief, H. D. Biddle, the purported Manager of Q-Consolidated, Inc. and/or Q-Consolidated, LLC, and signatory to the Subscription Agreement, is a fictional individual.

31.     The investment contract securities were not registered and were not federally covered or exempt under the Michigan Uniform Securities Act (2002), 2008 PA 551, as amended, MCL 451.2101 *et seq.* ("Securities Act").

32.     Nelms failed to state that he had a criminal history involving several felony convictions, a fact that a reasonable investor would consider to be an important fact when making an investment decision.

33.     Nelms failed to state that he was not registered in any capacity under the Securities Act in Michigan.

34.     Nelms omitted to state these material facts necessary to make other statements not misleading in connection with the offer or sale of securities.

35.     Nelms mishandled Ortiz's funds, illegally taking those funds to an account for his personal use and business expenses.

36.     Nelms' above-described misconduct has further resulted in IRS penalties and interest against Ortiz.

## COUNT I: BREACH OF CONTRACT

37.     Ortiz realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

38.     The parties entered into a valid, enforceable contract pursuant to which Nelms would manage and invest Ortiz's funds.

39.     Nelms promised to provide at least a 17-percent return on investment.

40.     Ortiz engaged Nelms and transferred his savings into an IRA self-directed account, as directed by Nelms.

41.     Nelms failed to manage the investment and failed to provide any accounting for the investment funds.

42.     Nelms' conduct as alleged herein constitutes breach of the parties' agreement.

43.     Ortiz has suffered actual damages as a result of Nelms' breaches of the parties' agreement.

WHEREFORE, Plaintiff Ortiz respectfully requests this Honorable Court enter Judgment in his favor and against Defendant Nelms in whatever amount this Court determines him to be

entitled, together with interest, costs and attorneys' fees, and any further relief this Court finds just and equitable.

## COUNT II: INTENTIONAL MISREPRESENTATION/FRAUD

44.     Ortiz realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

45.     Nelms made multiple material misrepresentations to Ortiz as described in detail, *supra*.

46.     Nelms' representations were material and caused Ortiz to invest considerable time and money in reliance of those representations.

47.     Nelms' representations were false and Nelms knew of their falsity.

48.     Nelms made these representations with the intention that Ortiz would act upon them.

49.     Ortiz relied on the representations of Nelms and would not have invested his money with Nelms otherwise.

50.     Ortiz suffered actual damages from the false representations.

WHEREFORE, Plaintiff Ortiz respectfully requests this Honorable Court enter Judgment in his favor and against Defendant Nelms in whatever amount this Court determines him to be entitled, together with interest, costs and attorneys' fees, and any further relief this Court finds just and equitable.

## COUNT III: COMMON LAW CONVERSION

51.     Ortiz realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

52.     As alleged in the preceding paragraphs, Nelms unlawfully and improperly converted Ortiz's property for his own use.

53.     Nelms did not have authority from Ortiz to convert his property.

54.     As a direct and proximate result of Nelms' conversation of his property, Ortiz has been damaged.

WHEREFORE, Plaintiff Ortiz respectfully requests this Honorable Court enter Judgment in his favor and against Defendant Nelms in whatever amount this Court determines him to be entitled, together with interest, costs and attorneys' fees, and any further relief this Court finds just and equitable.

## COUNT IV: STATUTORY CONVERSION

55.     Ortiz realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

56.     As alleged in the preceding paragraphs, Nelms unlawfully and improperly converted Ortiz's property for his own use.

57.     Nelms did not have authority from Ortiz to convert his property.

58.     As a direct and proximate result of Nelms' conversion of his property, Ortiz has been damaged.

59.     Nelms is liable for statutory conversion.

60.     Therefore, Ortiz seeks treble damages for the property Nelms unlawfully diverted to his own use pursuant to MCL § 600.2919a.

WHEREFORE, Plaintiff Ortiz respectfully requests this Honorable Court enter Judgment in his favor and against Defendant Nelms in whatever amount this Court determines him to be

entitled, together with interest, costs and attorneys' fees, and any further relief this Court finds just and equitable.

## COUNT V: EMBEZZLEMENT

61.     Ortiz realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

62.     Nelms stole and embezzled money when he diverted Ortiz' retirement savings to himself in violation of his obligation to management Ortiz's investments.

63.     Nelms' actions have damaged Ortiz by depriving him of his retirement savings and to its investment profits, as well as saddling him with IRS penalties and interest.

64.     Nelms' is liable for statutory embezzlement.

65.     Therefore, Ortiz seeks treble damages for the property Nelms unlawfully diverted to his own use pursuant to MCL § 600.2919a.

WHEREFORE, Plaintiff Ortiz respectfully requests this Honorable Court enter Judgment in his favor and against Defendant Nelms in whatever amount this Court determines him to be entitled, together with interest, costs and attorneys' fees, and any further relief this Court finds just and equitable.

## COUNT VI: BREACH OF FIDUCIARY DUTY

66.     Ortiz realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

67.     As Ortiz's purported investment advisor and manager, Nelms owed Ortiz numerous fiduciary duties, including but not limited to the duties of candor and loyalty.

68.     In transferring and/or stealing Ortiz' investment funds for his personal financial gain, Nelms breached his fiduciary duties.

69.     Additionally, in concealing that he had a criminal history involving several felony convictions and in employing a false name, Nelms breached his fiduciary duties.

70.     As a direct result of Nelms' breaches, Ortiz has been damaged.

WHEREFORE, Plaintiff Ortiz respectfully requests this Honorable Court enter Judgment in his favor and against Defendant Nelms in whatever amount this Court determines him to be entitled, together with interest, costs and attorneys' fees, and any further relief this Court finds just and equitable.

## COUNT VII: FRAUD OR DECEIT IN SALE OF SECURITY IN VIOLATION OF SECTION 10(B) OF THE SECURITIES AND EXCHANGE ACT OF 1934, 15 U.S.C. § 78J, AND RULE 10B-5, 17 CFR § 240.10B-5

71.     Ortiz realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

72.     Nelms violated § 10(b) of the 1934 Act and Rule 10b-5 because in connection with the offer, sale, or purchase of a security he:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff in connection with its purchase of N2N securities.

73.     Nelms disseminated the false statements specified above with knowledge of or reckless disregard for whether the statements were misleading by reason that such statements contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

74.     Nelms' false and misleading statements were made in connection with the sale of a security.

75.     Nelms' false and misleading statements were made with respect to material facts concerning the securities.

76.     Nelms' actions in this regard were done with scienter and an intention to mislead Ortiz.

77.     Ortiz relied upon Nelms' false and misleading representations, in that Ortiz would not have purchased the securities, if Nelms had not made false and misleading statements regarding material facts concerning the securities.

78.     As a direct and proximate result of Nelms' wrongful conduct, Ortiz suffered damages in connection with his purchases of securities by paying more than he would have paid absent Nelms' false and misleading statements.

WHEREFORE, Plaintiff Ortiz respectfully requests this Honorable Court enter Judgment in his favor and against Defendant Nelms in whatever amount this Court determines him to be entitled, together with interest, costs and attorneys' fees, and any further relief this Court finds just and equitable.

## COUNT VIII: FRAUD OR DECEIT IN SALE OF SECURITY IN VIOLATION OF THE UNIFORM SECURITIES ACT, MCL 421.2501

79.     Ortiz realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

80.     Nelms violated § 501 of the Securities Act, MCL 451.2051, because in connection with the offer, sale, or purchase of a security he:

    (a)    Employed devices, schemes, or artifices to defraud.

    (b)    Made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

    (c)    Engaged in an act, practice, or course of business that operated as a fraud or deceit on another person.

81.     Nelms disseminated the false statements specified above with knowledge of or reckless disregard for whether the statements were misleading by reason that such statements contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

82.     Nelms' false and misleading statements were made in connection with the sale of a security.

83.     Nelms' false and misleading statements were made with respect to material facts concerning the securities.

84.     Nelms' actions in this regard were done with scienter and an intention to mislead Ortiz.

85.     Ortiz relied upon Nelms' false and misleading representations, in that Ortiz would not have purchased the securities, if Nelms had not made false and misleading statements regarding material facts concerning the securities.

86.     As a direct and proximate result of Nelms' wrongful conduct, Ortiz suffered damages in connection with his purchases the securities by paying more than he would have paid absent Nelms' false and misleading statements.

WHEREFORE, Plaintiff Ortiz respectfully requests this Honorable Court enter Judgment in his favor and against Defendant Nelms in whatever amount this Court determines him to be entitled, together with interest, costs and attorneys' fees, and any further relief this Court finds just and equitable.

## COUNT IX: SALE OF UNREGISTERED SECURITIES IN VIOLATION OF THE UNIFORM SECURITIES ACT, MCL 451.2301

87.     Ortiz realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

11

88.     The investments sold to Ortiz, as described above, constitute securities under the Securities Act.

89.     The securities sold to Ortiz were not registered as required by MCL 451.2031, nor were they exempt from registration.

90.     The sale of the investments to Ortiz constitute a sale of securities in violation of MCL 451.2301.

91.     As a result of Nelms' sale of securities to Ortiz without registration, Ortiz has suffered damages.

WHEREFORE, Plaintiff Ortiz respectfully requests this Honorable Court enter Judgment in his favor and against Defendant Nelms in whatever amount this Court determines him to be entitled, together with interest, costs and attorneys' fees, and any further relief this Court finds just and equitable.

Respectfully submitted,

VARNUM LLP
Attorneys for Defendants


Dated: June 11, 2021                    By:    */s/ Herman D. Hofman*
                                               Jon M. Bylsma (P48790)
                                               Herman D. Hofman (P81297)
                                        Business Address:
                                               333 Bridge Street, N.W., Suite 1700
                                               P.O. Box 352
                                               Grand Rapids, MI 49501-0352
                                               (616) 336-6000
                                               jmbylsma@varnumlaw.com
                                               hdhofman@varnumlaw.com

17948461.1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

JOSE ORTIZ,

      Plaintiff,               Case No. _____

v                            Hon. _____

ROBERT NELMS,

      Defendant.

---

**<u>EXHIBITS</u>**
**<u>TO</u>**
**<u>COMPLAINT</u>**

1.      Subscription Agreement

2.      MGMC, LP Private Offering

# Exhibit 1



Jose Ortiz, Jr

# **SUBSCRIPTION BOOKLET**

**MGMC Limited Partnership**

**Offering of Limited Partnership Interests**

## CONTENTS

Instructions for Subscription

Exhibit A:      Wiring and Check Instructions

Exhibit B:      Subscription Agreement

Exhibit C:      Confidential Purchaser Questionnaire

Exhibit D:      Signature page to Amended and Restated Operating Agreement of MGMC Limited Partnership

**MGMC LIMITED PARTNERSHIP**
<u>**SUBSCRIPTION BOOKLET**</u>

**INSTRUCTIONS FOR SUBSCRIPTION FOR LIMITED PARTNERSHIP INTERESTS**

Each subscriber for Limited Partnership Interests offered must do the following:

1.  Deliver payment in the minimum amount of $50,000 for Limited Partnership Interests subscribed for in accordance with the wire transfer and check instructions attached hereto as <u>Exhibit A</u>.

2.  Complete, sign and deliver the Subscription Agreement included in this Subscription Booklet.

3.  Complete, sign and deliver the Confidential Purchaser Questionnaire included in this Subscription Booklet.

4.  Complete, sign and deliver the signature page to the Agreement of Limited Partnership of MGMC Limited Partnership attached hereto as <u>Exhibit D</u>.

    Delivery of the completed subscription documents described above and check (if applicable) should be delivered directly to Q-Consolidated, LLC at the following address:

**Q-Consolidated, Inc.**
**General Partner, MGMC LP**
**P.O. Box 414**
**Zeeland, Michigan 49464**
**Telephone: 317-308-8104**
**Email: <u>compliance@qci-us.com</u>**
**Please make check payable to: MGMC LP**

THE COMPANY MAY ACCEPT OR REJECT SUBSCRIPTIONS IN ITS SOLE DISCRETION. THE OFFERING IS AVAILABLE ONLY TO "ACCREDITED INVESTORS" AS DEFINED UNDER REGULATION D UNDER THE SECURITIES ACT OF 1933, AS AMENDED. In the event that a subscription offer is not accepted by the Company, the subscription funds shall be returned to the subscriber, without interest or deduction thereon.

**EXHIBIT B**

## SUBSCRIPTION AGREEMENT

**Please review, sign on page S-1, and return to:**

**Q-Consolidated, Inc.**
**General Partner, MGMC LP**
**P.O. Box 414**
**Zeeland, Michigan 49464**
**Telephone: 317-308-8104**
**Email: compliance@qci-us.com**

## MGMC LIMITED PARTNERSHIP
## SUBSCRIPTION AGREEMENT

The undersigned (hereinafter **Subscriber**) hereby confirms a subscription for the purchase of limited partnership interests (**Partnership Interests**) of MGMC Limited Partnership, a Texas limited partnership (**Company** or **Partnership**). The minimum dollar amount that may be subscribed for is $50,000, unless waived by Q-Consolidated, LLC, the general partner of the Partnership (**General Partner**), in its sole discretion. The Partnership Interests are sometimes referred to herein as the **Securities**. Capitalized terms used and not otherwise defined herein shall have the meanings set forth for such terms in the Confidential Private Placement Memorandum, dated as of January 1, 2014 (as amended or supplemented, and together with all documents and filings attached thereto, the **Memorandum**).

The Company and Subscriber are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Rule 506 of Regulation D (**Regulation D**) as promulgated by the Securities and Exchange Commission (the **SEC**) under the Securities Act of 1933, as amended (the **Act**) and Section 4(2) of the Act.

In connection with this subscription, Subscriber and the Company agree as follows:

1.      Purchase and Sale of the Securities.

        (a)      The Company agrees to issue and to sell to Subscriber, and Subscriber hereby agrees to purchase from the Company, Partnership Interests in the amount set forth on the signature page hereto. Upon acceptance of this Subscription Agreement by the General Partner, the General Partner shall establish a capital account for Subscriber in the dollar amount subscribed for (**Capital Contribution**) and accepted by the General Partner.

        (b)      Subscriber has hereby delivered and paid concurrently herewith the purchase price (the **Purchase Price**) set forth on the signature page hereof required to purchase the Partnership Interests subscribed for hereunder which amount has been paid in U.S. Dollars by wire transfer or check, subject to collection, to the order of **MGMC Limited Partnership**.

        (c)      Upon acceptance of Subscriber's subscription, (1) the Company shall establish a capital account for Subscriber in the amount of its Capital Contribution, and shall deliver to or as directed by Subscriber: all other instruments and writings required to have been delivered at or prior to the Closing by the Company pursuant to this Agreement; and (2) each Subscriber shall deliver or cause to be delivered to the Company: by check or wire transfer of immediately available funds in accordance with the Company's written wire instructions, its Capital Contribution, and all documents, instruments and writings required to have been delivered by Subscriber pursuant to this Agreement.

2.     Representations and Warranties of Subscriber.  Subscriber represents and warrants to the Company and the General Partner as follows:

(a)     At the time Subscriber was offered the Securities, Subscriber was, and on the date Subscriber receives the Securities will be, an Accredited Investor as defined by Rule 501 under the Act, and Subscriber is capable of evaluating the merits and risks of Subscriber's investment in the Company and has the capacity to protect Subscriber's own interests.

(b)     Subscriber understands that the Securities are not presently registered and may never become registered. Subscriber acknowledges that the Securities must be held indefinitely unless subsequently registered under the Act or unless an exemption from such registration is available.

(c)     Subscriber acknowledges and understands that the Securities are being purchased for investment purposes and not with a view to distribution or resale, nor with the intention of selling, transferring or otherwise disposing of all or any part thereof for any particular price, or at any particular time, or upon the happening of any particular event or circumstances, except selling, transferring, or disposing the Securities made in full compliance with all applicable provisions of the Act, the rules and regulations promulgated by the SEC thereunder, and applicable state securities laws; and that an investment in the Securities is not a liquid investment.

(d)     Subscriber acknowledges that the Partnership Interests are not publicly traded securities.

(e)     Subscriber acknowledges that Subscriber has had the opportunity to ask questions of, and receive answers from the General Partner or any person acting on their behalf concerning the Company and its business and to obtain any additional information, to the extent possessed by the Company (or to the extent it could have been acquired by the Company without unreasonable effort or expense) necessary to verify the accuracy of the information received by Subscriber. In connection therewith, Subscriber acknowledges that Subscriber has had the opportunity to discuss the Company's business, management and financial affairs with the Company's management or any person acting on its behalf.  Subscriber has received and reviewed the Memorandum, and all the information, both written and oral, that it desires. Without limiting the generality of the foregoing, Subscriber has been furnished with or has had the opportunity to acquire, and to review, all information, both written and oral, that it desires with respect to the Company's business, management, financial affairs and prospects.  In determining whether to make this investment, Subscriber has relied solely on Subscriber's own knowledge and understanding of the Company and its business based upon Subscriber's own due diligence investigations and the information furnished pursuant to this paragraph.  Subscriber understands that no person has been authorized to give any information or to make any representations which were not furnished pursuant to this paragraph and Subscriber has not relied on any other representations or information.

(f)     Subscriber has all requisite legal and other power and authority to execute and deliver this Subscription Agreement and to carry out and perform Subscriber's obligations under the terms of this Subscription Agreement. This Subscription Agreement constitutes a valid and legally binding obligation of Subscriber, enforceable in accordance with its terms, and subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors and rules of law governing specific performance, injunctive relief or other general principals of equity, whether such enforcement is considered in a proceeding in equity or law.

(g)     Subscriber has carefully considered and has discussed with the Subscriber's professional legal, tax, accounting and financial advisors, to the extent the Subscriber has deemed necessary, the suitability of this investment and the transactions contemplated by this Subscription Agreement for the Subscriber's particular federal, state, local and foreign tax and financial situation and has determined that this investment and the transactions contemplated by this Subscription Agreement are a suitable investment for the Subscriber. Subscriber relies solely on such advisors and not on any statements or representations of the Company, or its agents. Subscriber understands that Subscriber (and not the Company) shall be responsible for Subscriber's own tax liability that may arise as a result of this investment or the transactions contemplated by this Subscription Agreement.

(h)     This Subscription Agreement and the Purchaser Questionnaire do not contain any untrue statement of a material fact or omit any material fact concerning Subscriber.

(i)     There are no actions, suits, proceedings or investigations pending against Subscriber or Subscriber's properties before any court or governmental agency (nor, to Subscriber's knowledge, is there any threat thereof) which would impair in any way Subscriber's ability to enter into and fully perform Subscriber's commitments and obligations under this Subscription Agreement or the transactions contemplated hereby.

(j)     The execution, delivery and performance of and compliance with this Subscription Agreement, and the issuance of the Securities will not result in any material violation of, or conflict with, or constitute a material default under, any of Subscriber's articles of incorporation or bylaws, if applicable, or any of Subscriber's material agreements nor result in the creation of any mortgage, pledge, lien, encumbrance or charge against any of the assets or properties of Subscriber or the Securities.

(k)     Subscriber acknowledges that the Securities are speculative and involve a high degree of risk and that Subscriber can bear the economic risk of the purchase of the Securities, including a total loss of an investment.

(l)     Subscriber acknowledges they have carefully reviewed and considered the risk factors discussed in the "Risk Factors" section of the Memorandum.

(m)     Subscriber recognizes that no federal, state or foreign agency has recommended or endorsed the purchase of the Securities.

3

(n)     Subscriber is aware that the Securities are and will be, when issued, "restricted securities" as that term is defined in Rule 144 of the general rules and regulations under the Act.

(o)     Subscriber understands that any and all certificates representing the Securities and any and all securities issued in replacement thereof or in exchange therefor shall bear the following legend or one substantially similar thereto, which Subscriber has read and understands:

> "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND NEITHER THE SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR SUCH LAWS OR AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT AND SUCH LAWS WHICH, IN THE OPINION OF COUNSEL FOR THIS CORPORATION, IS AVAILABLE."

(p)     In addition, the certificates representing the Securities, and any and all securities issued in replacement thereof or in exchange therefor, shall bear such legend as may be required by the securities laws of the jurisdiction in which Subscriber resides.

(q)     Subscriber acknowledges that Subscriber has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of an investment in the Securities and of making an informed investment decision.

(r)     Subscriber represents that: (i) Subscriber is able to bear the economic risks of an investment in the Securities and to afford the complete loss of the investment; and (ii) (A) Subscriber could be reasonably assumed to have the capacity to protect his/her/its own interests in connection with this subscription; or (B) Subscriber is personally qualified to evaluate and assess the risks, nature and aspects of this subscription.

(s)     Subscriber further represents that the address set forth below is his/her principal residence (or, if Subscriber is a company, partnership or other entity, the address of its principal place of business); that Subscriber is purchasing the Securities for Subscriber's own account and not, in whole or in part, for the account of any other person; Subscriber is purchasing the Securities for investment and not with a view to resale or distribution; and that Subscriber has not formed any entity for the purpose of purchasing the Securities.

(t)     Subscriber understands that the General Partner shall have the unconditional right to accept or reject this subscription, in whole or in part, for any reason or without a specific reason, in the sole and absolute discretion of the General Partner (even after receipt

4

and clearance of Subscriber's funds). This Subscription Agreement is not binding upon the Company until accepted by the General Partner. In the event that the subscription is rejected, then Subscriber's subscription funds will be returned without interest thereon or deduction therefrom.

(u)     Subscriber has not been furnished with any oral representation or oral information in connection with the offering of the Securities that is not contained in the Memorandum and this Subscription Agreement.

(v)     Subscriber has carefully read this Subscription Agreement and the Memorandum, and Subscriber has accurately completed the Purchaser Questionnaire which accompanies this Subscription Agreement.

(w)     No representations or warranties have been made to Subscriber by the General Partner, or any of its officers, employees, agents, affiliates, other than the representations of the Company contained herein, and in subscribing for the Securities the Subscriber is not relying upon any representations other than those contained in the Memorandum or in this Subscription Agreement.

(x)     Subscriber represents and warrants, to the best of its knowledge, that no finder, broker, agent, financial advisor or other intermediary, nor any purchaser representative or any broker-dealer acting as a broker, is entitled to any compensation in connection with the transactions contemplated by this Subscription Agreement.

(y)     Subscriber represents and warrants that Subscriber has: (i) not distributed or reproduced the Memorandum, in whole or in part, at any time, without the prior written consent of the General Partner, and (ii) kept confidential the existence of the Memorandum and the information contained therein or made available in connection with any further investigation of the Company.

(z)     The Subscriber is not a prohibited country, territory, individual or entity listed on the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") website and is not directly or indirectly affiliated with any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs. All amounts subscribed for in this Subscription Agreement by the Subscriber were not directly or indirectly derived from activities that may contravene Federal, state or international laws and regulations, including anti-money laundering and anti-terrorist financing laws and regulations.

3.     Representations and Warranties of Q Consolidated and the Company. Q Consolidated and the Company represent and warrant to Subscriber as follows:

(a)     Each of Q-Consolidated and the Company are duly organized and validly existing entities in the respective jurisdictions in which each was formed.

5

(b)     Q Consolidated and the Company have all such corporate powers and authority to enter into, deliver and perform this Subscription Agreement.

(c)     All necessary corporate action has been duly and validly taken by each of Q Consolidated and the Company to authorize the execution, delivery and performance of this Subscription Agreement by each of Q Consolidated and the Company, and the issuance and sale of the Securities to be sold by the Company pursuant to this Subscription Agreement. This Subscription Agreement has been duly and validly authorized, executed and delivered by each of Q Consolidated and the Company and constitutes the legal, valid and binding obligation of each of Q Consolidated and the Company enforceable against each of Q-Consolidated and the Company in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general equitable principles.

### 4.     Covenants of the Company.

(a)     **Notice of Breaches.** Each of the Company and Subscriber shall give prompt written notice to the other of any breach by it of any representation, warranty or other agreement contained in this Subscription Agreement or any other document to which the Company and Subscriber has relied or is relying on in connection with the Offering (**Offering Documents**), as well as any events or occurrences arising after the date hereof, which would reasonably be likely to cause any representation or warranty or other agreement of such party, as the case may be, contained in the Offering Documents to be incorrect or breached as of and after the date a Subscription Agreement has been accepted by the General Partner. However, no disclosure by any party pursuant to this Section shall be deemed to cure any breach of any representation, warranty or other agreement contained in any Offering Documents.   No breach, default or other action by or claim against one Subscriber will be deemed a breach, default or action of or claim against of any other Subscriber or in any way adversely affect the rights of the other Subscribers.

5.     **Indemnification.** Subscriber agrees to indemnify and hold harmless each of the General Partner and the Company, and each of its respective managers, members, officers, directors, employees, stockholders, agents, counsel and affiliates, and any person acting on behalf of each of the General Partner or the Company (**Indemnities**), from and against any and all damage, loss, liability, cost and expense (including reasonable attorneys' fees) (**Loss**) which any of them may incur by reason of the failure by Subscriber to fulfill any of the terms and conditions of this Subscription Agreement, or by reason of any breach of the representations and warranties made by Subscriber herein, or in any other document provided by Subscriber to each of the General Partner and the Company.   All representations, warranties and covenants of each of the subscribers, General Partner and the Company contained herein shall survive the acceptance of this subscription.

6

6. **Miscellaneous.**

(a)     Subscriber agrees not to transfer or assign this Subscription Agreement or any of Subscriber's interest herein and further agrees that the transfer or assignment of the Securities acquired pursuant hereto shall be made only in accordance with all applicable laws and the Agreement of Limited Partnership of MGMC Limited Partnership.

(b)     Subscriber agrees that Subscriber cannot cancel, terminate, or revoke this Subscription Agreement or any agreement of Subscriber made hereunder, and this Subscription Agreement shall survive the death or legal disability of Subscriber and shall be binding upon Subscriber's heirs, executors, administrators, successors, and permitted assigns.

(c)     Subscriber has read and has accurately completed this entire Subscription Agreement.

(d)     This Subscription Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and may be amended only by a written execution by all parties.

(e)     Subscriber acknowledges that it has been advised to consult with their own attorney regarding this subscription and Subscriber has done so to the extent that Subscriber deems appropriate.

(f)     Any notice or other document required or permitted to be given or delivered to the Subscriber shall be in writing and sent (i) by fax if the sender on the same day sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid), or (b) by registered or certified mail with return receipt requested (postage prepaid) or (c) by a recognized overnight delivery service (with charges prepaid).

If to the Company, at:

Q Consolidated, Inc.
General Partner, MGMC LP
P.O. Box 414
Zeeland, Michigan 49464
Telephone: 317-308-8104
Email: compliance@qci-us.com

If to the Subscriber, at its address set forth on the signature page to this Subscription Agreement, or such other address as it shall have specified to the Company in writing.

7

(g)     Failure of the Company to exercise any right or remedy under this Subscription Agreement or any other agreement between the Company and the Subscriber, or otherwise, or delay by the Company in exercising such right or remedy, will not operate as a waiver thereof. No waiver by the Company will be effective unless and until it is in writing and signed by the Company.

(h)     This Subscription Agreement shall be enforced, governed and construed in all respects in accordance with the laws of the State of Delaware, as such laws are applied by the Delaware courts to agreements entered into and to be performed in Delaware by and between residents of Delaware, and shall be binding upon the Subscriber, the Subscriber's heirs, estate, legal representatives, successors and assigns and shall inure to the benefit of the Company, its successors and assigns.

(i)     Any legal suit, action or proceeding arising out of or relating to this Subscription Agreement or the transactions contemplated hereby shall be instituted exclusively in the United States District Court for the District of Delaware. The parties hereto hereby: (i) waives any objection which they may now have or hereafter have to the venue of any such suit, action or proceeding, and (ii) irrevocably consents to the jurisdiction of the United States District Court for the District of Delaware in any such suit, action or proceeding. The parties further agree to accept and acknowledge service of any and all process which may be served in any such suit, action or proceeding in the United States District Court for the District of Delaware and agree that service of process upon a party mailed by certified mail to such party's address shall be deemed in every respect effective service of process upon such party in any such suit, action or proceeding.

(j)     If any provision of this Subscription Agreement is held to be invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed modified to conform to such statute or rule of law. Any provision hereof that may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provisions hereof.

(k)     The parties understand and agree that money damages would not be a sufficient remedy for any breach of the Subscription Agreement by the Company or the Subscriber and that the party against which such breach is committed shall be entitled to equitable relief, including injunction and specific performance, as a remedy for any such breach. Such remedies shall not be deemed to be the exclusive remedies for a breach by either party of the Subscription Agreement but shall be in addition to all other remedies available at law or equity to the party against which such breach is committed.

(l)     All pronouns and any variations thereof used herein shall be deemed to refer to the masculine, feminine, singular or plural, as identity of the person or persons may require.

8

(m)     This Subscription Agreement may be executed in counterparts and by facsimile, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

(n)     The obligations of each Subscriber pursuant to the Memorandum and the exhibits thereto is several and not joint with the obligations of any other Subscriber and no Subscriber shall be responsible in any way for the performance of the obligations of any other Subscriber under the Memorandum and the exhibits thereto. Nothing contained herein or in the Memorandum or the exhibits thereto, and no action taken by any Subscriber pursuant thereto, shall be deemed to constitute the Subscribers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Subscribers are in any way acting in concert with respect to such obligations or the transactions contemplated by the Memorandum or the exhibits thereto. Each Subscriber shall be entitled to independently protect and enforce its rights, including without limitation the rights arising out of this Agreement or out of the Memorandum or the exhibits thereto, and it shall not be necessary for any other Subscriber to be joined as an additional party in any proceeding for such purpose. Each Subscriber has been represented by its own separate legal counsel in their review and negotiation of the Memorandum and the exhibits thereto.

[Signature Page Follows]

**Signature Page for Individuals:**

IN WITNESS WHEREOF, Subscriber has caused this Subscription Agreement to be executed as of the date indicated below.

$ _____225,000_____

**Subscription Amount**

_____Jose Ortz Jr._____

**Print or Type Name**

_____

**Signature**

_____3·30·2015_____

**Date**

_____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_____

**Social Security Number (if applicable)**

_____3313 Creek Ct. Holland, MI 49424_____

**Address**

Please check if applicable and include co-owner's information below (name, address, social security number):

_____ Joint Tenancy                    _____ Tenants in Common

------------------------------------------------------
------------------------------------------------------
------------------------------------------------------
------------------------------------------------------

S-1

IN WITNESS WHEREOF, each of Q-Consolidated and the Company have caused this Subscription Agreement to be executed, and the foregoing subscription accepted, as of the date indicated below.

**MGMC**
**LIMITED PARTNERSHIP**

By: Q-Consolidated, Inc.
General Partner

By: _____

Name: H. D. Biddle
Title: Manager

Date: _____3·31·15_____

**Q-CONSOLIDATED, Inc**

By: _____

Name: Ian Nelms
Title: Manager

Date: __3/31/2015__

[SIGNATURE PAGE TO SUBSCRIPTION AGREEMENT]

**Partnerships, Corporations or Other Entities:**

IN WITNESS WHEREOF, Subscriber has caused this Subscription Agreement to be executed as of the date indicated below.

$ _____
  **Subscription Amount**

_____
**Print or Type Name of Entity**

$N/A$

_____
**Address**

_____          _____
**Taxpayer I.D. No. (if applicable)**          **Date**

_____          _____
**Signature**                                  **Print or Type Name and Indicate**
                                                **Title or Position with Entity**

S-1

**EXHIBIT C**

## CONFIDENTIAL PURCHASER QUESTIONNAIRE

**Please review, sign on page 7, and return to:**

**Q-Consolidated LLC**
**General Partner, MGMC LP**
**P.O. Box 414**
**Zeeland, Michigan 49464**
**Telephone: 317-308-8104**
**Email: compliance@qci-us.com**

**PURCHASER QUESTIONNAIRE**

**MGMC LIMITED PARTNERSHIP**

THIS QUESTIONNAIRE MUST BE ANSWERED FULLY AND RETURNED ALONG WITH YOUR COMPLETED SUBSCRIPTION AGREEMENT IN CONNECTION WITH YOUR PROSPECTIVE PURCHASE OF LIMITED PARTNERSHIP INTERESTS OF MGMC LIMITED PARTNERSHIP (THE **COMPANY**).

THE INFORMATION SUPPLIED IN THIS QUESTIONNAIRE WILL BE HELD IN STRICT CONFIDENCE. NO INFORMATION WILL BE DISCLOSED EXCEPT TO THE EXTENT THAT SUCH DISCLOSURE IS REQUIRED BY LAW OR REGULATION, OTHERWISE DEMANDED BY PROPER LEGAL PROCESS OR IN LITIGATION INVOLVING THE COMPANY AND ITS CONTROLLING PERSONS.

(1)     The undersigned represents and warrants that he, she or it comes within at least one category marked below, and that for any category marked, he, she or it has truthfully set forth, where applicable, the factual basis or reason the undersigned comes within that category. The undersigned agrees to furnish any additional information which the Company deems necessary in order to verify the answers set forth below.

Category A \_\_\_     The undersigned is an individual (not a partnership, corporation, etc.) whose individual net worth, or joint net worth with his or her spouse, presently exceeds $1,000,000. For purposes of this Category A, "net worth" means the excess of total assets at fair market value (including personal and real property, but excluding the estimated fair market value of a person's primary home) over total liabilities. Total liabilities excludes any mortgage on the primary home in an amount of up to the home's estimated fair market value as long as the mortgage was incurred more than 60 days before the Offering Units are purchased, but includes (i) any mortgage amount in excess of the home's fair market value and (ii) any mortgage amount that was borrowed during the 60-day period before the closing date for the sale of Offering Units for the purpose of investing in the Offering Units.

Explanation. In calculating net worth you may include equity in personal property and real estate, (excluding your primary residence), cash, short-term investments, stock and securities. Equity in personal property and real estate should be based on the fair market value of such property less debt secured by such property.

Category B \_\_\_     The undersigned is an individual (not a partnership, corporation, etc.) who had an income in excess of $200,000 in each of the two most recent years, or joint income with his or her spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the

same income level in the current year. For purposes of this Category B, " income" means annual adjusted gross income, as reported for federal income tax purposes, plus (i) the amount of any tax-exempt interest income received; (ii) the amount of losses claimed as a limited partner in a limited partnership; (iii) any deduction claimed for depletion; (iv) amounts contributed to an IRA or Keogh retirement plan; (v) alimony paid; and (vi) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Internal Revenue Code of 1986, as amended.

Category C ___     The undersigned is a director or executive officer of the Company which is issuing and selling the Securities (as defined in the Company's Subscription Agreement delivered along with this Purchaser Questionnaire (the "Subscription Agreement")).

Category D ___     The undersigned is a bank, as defined in Section 3(a)(2) of the Securities Act of 1933, as amended (the "Act"); a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act, whether acting in its individual or fiduciary capacity; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment advisor, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors (describe entity).

_____
_____

Category E ___     The undersigned is a private business development company as defined in section 202(a) (22) of the Investment Advisors Act of 1940. (describe entity)

_____

Category F ___    The undersigned is either a corporation, partnership, Massachusetts business trust, or non-profit organization within the meaning of Section 501(c)(3) of the Internal Revenue Code, in each case not formed for the specific purpose of acquiring the Securities and with total assets in excess of $5,000,000. (describe entity)

_____

Category G ___    The undersigned is a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Securities, where the purchase is directed by a "sophisticated investor" as defined in Regulation 506(b)(2)(ii) under the Act.

Category H ___    The undersigned is an entity (other than a trust) in which ALL of the equity owners are "accredited investors" within one or more of the above categories. If relying upon this Category alone, EACH equity owner must complete a separate copy of this Purchaser Questionnaire. (describe entity)

_____

The undersigned agrees that the undersigned will notify the Company at any time on or prior to the closing (as defined in the Company's Confidential Private Placement Memorandum, relating to the issuance of securities) in the event that the representations and warranties in this Purchaser Questionnaire shall cease to be true, accurate and complete.

(2)    Suitability (please answer each question)

(a)    For an individual, please describe your current employment, including the company by which you are employed and its principal business:

_____

(b)     For an individual, please describe any college or graduate degrees held by
        you:

_____

_____

_____

(c)     For all subscribers, please list types of prior investments:

        _____ 401K _____

_____

(d)     For all subscribers, please state whether you have you participated in
        other private placements before:

        YES  _____       NO  __✗__

(e)     If your answer to question (d) above was "YES", please indicate frequency
        of such prior participation in private placements of:

|                | Public Companies | Private Companies |
|----------------|------------------|-------------------|
| Frequently     |                  |                   |
| Occasionally   |                  |                   |
| Never          |                  |                   |

(f)     For individuals, do you expect your current level of income to significantly
        decrease in the foreseeable future?

        YES  _____       NO  __✗__

(g)     For trust, corporate, partnership and other institutional subscribers, do
        you expect your total assets to significantly decrease in the foreseeable
        future?

        YES  _____       NO  __✗__

(h)     For all subscribers, do you have any other investments or contingent
        liabilities which you reasonably anticipate could cause you to need
        sudden cash requirements in excess of cash readily available to you?

YES _____ NO ___✗___

(i) For all subscribers, are you familiar with the risk aspects and the non-liquidity of investments such as the Securities for which you seek to purchase?

YES ___✗___ NO _____

(j) For all subscribers, do you understand that there is no guarantee of financial return on this investment and that you run the risk of losing your entire investment?

YES ___✗___ NO _____

(3) Manner in which title is to be held: (circle one)

(a) Individual Ownership
(b) Community Property
(c) Joint Tenant with Right of Survivorship (both parties must sign)
(d) Partnership
(e) Tenants in Common
(f) Company
(g) Trust
(h) Other

(4) FINRA Affiliation.

Are you affiliated or associated with a FINRA member firm (please check one):

YES _____          NO ___✗___

If Yes, please describe:

_____
_____
_____

*If subscriber is a Registered Representative with a FINRA member firm, have the following acknowledgment signed by the appropriate party:

The undersigned FINRA member firm acknowledges receipt of the notice required by Article 3, Sections 28(a) and (b) of the Rules of Fair Practice.

_____

Name of FINRA Member Firm

By: _____
     Authorized Officer

Date: _____

[Remainder of page intentionally left blank]

The undersigned is informed of the significance to the Company of the foregoing representations and answers contained in this Purchaser Questionnaire and such answers have been provided under the assumption that the Company will rely on them.

**Individual**

Date: 3-30-2015

Jose Ortiz Jr.

Name of Individual
(Please type or print)

Signature of Individual

For use with Joint Tenancy Investments.

**Individual**

Date: 3 - 30 - 2015

Jose Ortiz Jr.

Name of Individual
(Please type or print)

Signature of Individual

**Partnership, Corporation or Other Entity**

Date: _____

_____
Print or Type Entity Name

By:
Name: _____
Print or Type Name

Title: _____

_____
Signature

**Exhibit D**

**Signature page to Agreement of Limited Partnership of**
**MGMC LIMITED PARTNERSHIP**

IN WITNESS WHEREOF, the parties have executed this Agreement of Limited Partnership as of this 1st day of October, 2014.

MGMC LIMITED PARTNERSHIP

By: Q-Consolidated, LLC
General Partner

By: _____
NAME, Manager
H. D. Biddle

By: _____
Ian Nelms, Managing Member

33

*Jose Ortiz, Se*

## SUBSCRIPTION BOOKLET

**MGMC Limited Partnership**

**Offering of Limited Partnership Interests**

## CONTENTS

Instructions for Subscription

Exhibit A:    Wiring and Check Instructions

Exhibit B:    Subscription Agreement

Exhibit C:    Confidential Purchaser Questionnaire

Exhibit D:    Signature page to Amended and Restated Operating Agreement of MGMC
              Limited Partnership

**MGMC LIMITED PARTNERSHIP**
**SUBSCRIPTION BOOKLET**

**INSTRUCTIONS FOR SUBSCRIPTION FOR LIMITED PARTNERSHIP INTERESTS**

Each subscriber for Limited Partnership Interests offered must do the following:

1.  Deliver payment in the minimum amount of $50,000 for Limited Partnership Interests subscribed for in accordance with the wire transfer and check instructions attached hereto as Exhibit A.

2.  Complete, sign and deliver the Subscription Agreement included in this Subscription Booklet.

3.  Complete, sign and deliver the Confidential Purchaser Questionnaire included in this Subscription Booklet.

4.  Complete, sign and deliver the signature page to the Agreement of Limited Partnership of MGMC Limited Partnership attached hereto as Exhibit D.

    Delivery of the completed subscription documents described above and check (if applicable) should be delivered directly to Q-Consolidated, LLC at the following address:

**Q-Consolidated, Inc.**
**General Partner, MGMC LP**
**P.O. Box 414**
**Zeeland, Michigan 49464**
**Telephone: 317-308-8104**
**Email: compliance@qci-us.com**
**Please make check payable to: MGMC LP**

THE COMPANY MAY ACCEPT OR REJECT SUBSCRIPTIONS IN ITS SOLE DISCRETION. THE OFFERING IS AVAILABLE ONLY TO "ACCREDITED INVESTORS" AS DEFINED UNDER REGULATION D UNDER THE SECURITIES ACT OF 1933, AS AMENDED. In the event that a subscription offer is not accepted by the Company, the subscription funds shall be returned to the subscriber, without interest or deduction thereon.

**EXHIBIT B**

## SUBSCRIPTION AGREEMENT

**Please review, sign on page S-1, and return to:**

**Q-Consolidated, Inc.**
**General Partner, MGMC LP**
**P.O. Box 414**
**Zeeland, Michigan 49464**
**Telephone: 317-308-8104**
**Email: compliance@qci-us.com**

4

# Exhibit 2

# MGMC, LP



A Private Offering for
Accredited Investors

## *MGMC LIMITED PARTNERSHIP*
# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
### *FOR ACCREDITED INVESTORS ONLY*

MGMC LIMITED PARTNERSHIP (THE "PARTNERSHIP") IS A DELAWARE LIMITED PARTNERSHIP ORGANIZED IN SEPTEMBER 2014, WHICH SEEKS CAPITAL APPRECIATION BY INVESTING IN, AND Q-CONSOLIDATED, LLC IS A DELAWARE LIMITED LIABILITY COMPANY (THE "GENERAL PARTNER") AND SERVES AS THE GENERAL PARTNER OF THE PARTNERSHIP.

THERE CAN BE NO ASSURANCE THAT THE INVESTMENT OBJECTIVES OF THE GENERAL PARTNER WILL BE ACHIEVED. SEE "INVESTMENT METHODOLOGY," "MANAGEMENT OF THE MGMC LIMITED PARTNERSHIP", "CONFLICTS OF INTEREST" AND "RISK FACTORS."

THE INTERESTS ARE BEING PRIVATELY OFFERED AND SOLD BY THE PARTNERSHIP PURSUANT TO AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED FOR IN REGULATION D UNDER THE ACT AND RULE 506 THEREOF TO "ACCREDITED INVESTORS" AS DEFINED IN RULE 501 OF THE ACT. THE MINIMUM INTEREST THAT MAY BE PURCHASED IS $50,000, UNLESS WAIVED BY THE GENERAL PARTNER. THERE IS NO MINIMUM OR MAXIMUM AMOUNT OF INTERESTS THAT MAY BE SOLD. INTERESTS MAY BE PURCHASED ON THE FIRST CALENDAR DAY OF EACH CALENDAR MONTH OR AT OTHER TIMES THAT THE GENERAL PARTNER MAY DETERMINE, SUBJECT TO CERTAIN RESTRICTIONS. ALL SUBSCRIPTIONS RECEIVED FROM PROSPECTIVE INVESTORS WILL BE HELD IN A SEPARATE INTEREST BEARING ACCOUNT UNTIL THE END OF THE CALENDAR MONTH IN WHICH THEY ARE RECEIVED OR UNTIL INVESTED IN THE PARTNERSHIP. UPON THE CLOSE OF BUSINESS ON THE LAST BUSINESS DAY (AS DEFINED IN THE LIMITED PARTNERSHIP AGREEMENT) OF EACH CALENDAR MONTH, ALL OR A PORTION OF SUCH INTEREST MAY BE WITHDRAWN ON 30 DAYS PRIOR WRITTEN NOTICE TO THE GENERAL PARTNER, SUBJECT TO CERTAIN RESTRICTIONS. NO SECONDARY MARKET FOR THE INTERESTS EXISTS, AND NONE IS LIKELY TO DEVELOP. SEE "PURCHASE PROCEDURE."

THE INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*The date of this Confidential Private Offering Memorandum (the "Memorandum") is October 1, 2014.*

MGMC, LP

## TABLE OF CONTENTS

NOTICES ......................................................................................................5

SUMMARY ..................................................................................................6

THE PARTNERSHIP ......................................................................................9

OFFERING OF INTERESTS ...........................................................................9
    Suitability Requirements...........................................................................9
    Transferability.........................................................................................13
    Capital Contributions ..............................................................................13
    Purchase Procedure................................................................................13

INVESTMENT METHODOLOGY ..................................................................14
    Objective and General Approach..............................................................14
    Investment Authority and Restrictions......................................................14
    Leveraged Purchase of Securities .............................................................15
    Short Sales .............................................................................................15
    Options ..................................................................................................15
    Holding Period and Turnover...................................................................16
    Cash and Cash Equivalents ......................................................................16
    Diversification and Concentration ............................................................16
    Inherent Risks ........................................................................................16

MANAGEMENT OF THE PARTNERSHIP ......................................................17

INCENTIVE ALLOCATION...........................................................................18
    Salaries..................................................................................................19
    Initial Offering and Organizational Expenses .............................................19
    Finder's Fees ..........................................................................................19
    Other Expenses ......................................................................................19

TAX CONSIDERATIONS ............................................................................20
    Classification as a Partnership .................................................................21
    Capital Accounts; Tax Basis in the Interests................................................21
    Allocation of Taxable Income or Loss from Securities ...................................21
    Limitations on Deductibility of Partnership Losses.......................................21
    Passive Loss Rules ..................................................................................22
    Partners Distributive Shares ....................................................................22
    Distributions and Withdrawals/Redemption ..............................................23
    Partnership's Liquidation.........................................................................23
    Portfolio Management Strategies.............................................................24
    Interest Expense ....................................................................................24

Case 1:21-cv-00495  ECF No. 1-3,  PageID.47  Filed 06/11/21  Page 5 of 57
Case 3:22-mc-00020-L-BH     Document 2-3     Filed 03/18/22     Page 48 of 100     PageID 72

MGMC, LP

Tax Treatment of Partnership Operations ..................................................... 25
Mark to Market 475(f) Election ..................................................... 26
U.S. Federal Taxation of Partners-Traders versus Investors ........................... 26
Tax Reporting by the Partnership ..................................................... 26
Tax Exempt Organizations ..................................................... 27
Foreign Investors ..................................................... 27
State and Local Tax Considerations ..................................................... 29

CONFLICTS OF INTEREST ..................................................... 30
Non Arms Length Agreements ..................................................... 30
Incentive Allocation and Fees ..................................................... 31
Competition with the Partnership ..................................................... 31
Conflicts as to Investment Opportunities ..................................................... 31

RISK FACTORS ..................................................... 32
GENERAL ..................................................... 32
Reliance on the General Partner ..................................................... 32
Limited Partners Will Not Participate In Management ..................... 32
Operating Deficits ..................................................... 32
INVESTMENT RISKS ..................................................... 33
Investments May Be Speculative ..................................................... 33
Brokerage Commissions/Transaction Costs ..................................... 33
Illiquidity of Markets ..................................................... 33
Margin and Leverage ..................................................... 33
Risks Related to Securities Trading ..................................................... 34
Short Selling ..................................................... 35
Credit or Conversion Risk ..................................................... 35
Concentration of Investments ..................................................... 35
General Economic and Market Conditions ..................................... 35
Changes in Investment Strategies ..................................................... 36
Limited Liquidity of Some Investments ..................................................... 36
Insolvency of Brokers and Others ..................................................... 36
PARTNERSHIP RISKS ..................................................... 36
Tax Liability without Distributions ..................................................... 36
No Public Market for Interests ..................................................... 37
Effect of Substantial Withdrawals ..................................................... 37
Potential Mandatory Withdrawal ..................................................... 37
OTHER RISKS ..................................................... 37
Tax Considerations ..................................................... 37
Limitations on Deductions ..................................................... 38
Allocations ..................................................... 38

MGMC, LP

Possibility of Taxation as a Corporation ............................................. 38
Possibility of Tax Audits ..................................................................... 38
Other Possible Tax Law Changes ....................................................... 39
Regulatory Matters ................................................................................. 39
Investment Company Regulation ...................................................... 39
Private Offering Exemption ............................................................... 40
Other .................................................................................................. 40
Litigation ............................................................................................ 40
Possible Indemnification Obligations ................................................ 40

**EMPLOYEE BENEFIT PLANS SUBJECT TO ERISA ....................................... 41**
General ................................................................................................... 41
Unrelated Business Taxable Income ....................................................... 42

**BROKERAGE AND TRANSACTIONAL PRACTICES ...................................... 43**
Selection Criteria, Generally ................................................................... 43
Brokerage, Custody, and Clearing and Settling ...................................... 43
Soft Dollars .............................................................................................. 43

**SUMMARY OF THE LIMITED PARTNERSHIP AGREEMENT ........................ 44**
Management Responsibilities of the General Partner .............................. 44
Exercise of Rights by Limited Partners .................................................... 45
Sharing of Profits and Losses .................................................................. 46
Allocation of Tax Profit and Loss ............................................................ 46
Definition of Terms ................................................................................. 48
Withdrawals ............................................................................................ 48
Distributions ............................................................................................ 50
Accounts, Records, Reports and Pricing ................................................. 50
Liabilities ................................................................................................. 51
Indemnification ....................................................................................... 51
Termination ............................................................................................. 52
Fiscal Year ............................................................................................... 53
Governing Law ......................................................................................... 53
Miscellaneous Provisions ........................................................................ 53

**PRIVACY POLICY ...................................................................................... 53**
Collection of Investor Information ........................................................... 53
Disclosure of Nonpublic Personal Information ....................................... 54
Protection of Investor Information .......................................................... 54
Changes to Privacy Policy ....................................................................... 55

## NOTICES

NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS NOT CONTAINED HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED. THE DELIVERY OF THIS MEMORANDUM AT ANY TIME DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE OF ITS ISSUE.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, A SECURITY IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION IN SUCH JURISDICTION.

INVESTMENT IN THE INTERESTS INVOLVES A HIGH DEGREE OF RISK AND IS SUITABLE ONLY FOR A SOPHISTICATED INVESTOR FOR WHICH SUCH INVESTMENT DOES NOT CONSTITUTE A COMPLETE INVESTMENT PROGRAM AND WHICH FULLY UNDERSTANDS AND IS WILLING TO ASSUME THE RISKS INVOLVED. ONLY A PERSON OR ENTITY WHICH QUALIFIES AS AN "ACCREDITED INVESTOR" MAY INVEST IN THE INTERESTS. NO PERSON WHICH IS NOT CAPABLE INDEPENDENTLY OF EVALUATING ANY INFORMATION CONTAINED IN THIS MEMORANDUM AND THE RISKS INVOLVED IN THE PURCHASE OF THE INTERESTS SHOULD CONSIDER DOING SO.

A PROSPECTIVE PURCHASER OF INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS TAX OR LEGAL ADVICE. THIS MEMORANDUM SHOULD BE REVIEWED BY THE PROSPECTIVE PURCHASER AND ITS INVESTMENT, TAX, LEGAL OR OTHER ADVISERS. EXECUTIVE OFFICERS AND REPRESENTATIVES OF THE GENERAL PARTNER ARE AVAILABLE TO EACH PROSPECTIVE INVESTOR AND/OR ITS REPRESENTATIVES TO ANSWER QUESTIONS CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING OF INTERESTS AND TO FURNISH ANY ADDITIONAL INFORMATION, TO THE EXTENT THAT THEY POSSESS OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN OR TO ENABLE IT TO EVALUATE THE MERITS AND RISKS RELATING TO THE PURCHASE OF INTERESTS.

BY ACCEPTING RECEIPT OF THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR AGREES NOT TO DUPLICATE OR TO FURNISH COPIES OF THIS MEMORANDUM TO PERSONS OTHER THAN SUCH OFFEREE'S INVESTMENT, TAX, ACCOUNTING OR LEGAL ADVISERS AND AGREES TO RETURN THIS MEMORANDUM TO THE GENERAL PARTNER PROMPTLY AFTER SUCH TIME AS SUCH OFFEREE IS NO LONGER CONSIDERING AN INVESTMENT IN THE INTERESTS.

THIS MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE HEREIN, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS OF DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

MGMC, LP

# SUMMARY

The following summary briefly describes the offering of Interests in MGMC Limited Partnership and is qualified in its entirety by the detailed information appearing elsewhere in this Memorandum.

### The Partnership:

MGMC Limited Partnership is a Delaware limited partnership organized in September of 2014. The Partnership's principal office is at 15221 Dunn Drive Traverse City Michigan, 49686; its telephone number is 317-308-8104. The mailing address is MGMC, LP PO Box 414 Zeeland, Michigan 49464.

### General Partner:

Q-Consolidated, LLC ("Q-Con") is a Delaware Limited Liability Company organized in September of 2014, and is the general partner of the Partnership.

### Investment Objective:

The Partnership's investment objective is to seek capital appreciation by investing in, public and private equity offerings, commercial credit, real estate investments, distressed assets, equities, exchange traded funds, options, futures, currency and other securities and financial instruments. The firm pursues situations where it can readily identify value creation in a predictable time frame and where its core competencies and competitive advantages translate into sustainable and attractive risk-adjusted returns.

The credit strategy includes Corporate Securities, Private Placement, Debentures, MTN's (medium term notes), Loan Portfolios and Special Opportunities in developed and emerging markets. The Real Estate strategy includes value-add and income-oriented commercial real estate investments, as well as real estate loan transactions. By conducting bottom-up analysis that includes fundamental credit analysis, advanced commercial real estate valuation and proven pricing models supported by modern portfolio theory, the investment manager uncovers the true intrinsic value of an investment, thereby seeing opportunities where others see only risk.

There can be no assurance that the Partnership's investment objective will be achieved. See "RISK FACTORS."

### Offering:

Interests are being privately offered and sold by the Partnership pursuant to an exemption from the registration provisions of the Act provided for in Regulation D and Rule 506. The minimum Interest which may be purchased is $50,000, unless waived by the General Partner. Interests may be purchased as of the first calendar day of each calendar month or at other times which the General Partner may determine, subject to certain restrictions. There is no minimum or maximum amount of Interests that may be accepted by the Partnership pursuant to this offering. The General Partner will restrict the number of Partners to 100 or fewer and will offer

Case 1:21-cv-00495 ECF No. 1-3, PageID.51 Filed 06/11/21 Page 9 of 57
Case 3:22-mc-00020-L-BH Document 2-3 Filed 03/18/22 Page 52 of 100 PageID 76

MGMC, LP

the Interests only through non-public transactions in order to avoid being classified as an "investment company" under the Investment Company Act of 1940.

### Term:

Unless earlier dissolved, the Partnership shall cease doing business on December 31, 2064, and shall thereupon be dissolved.

### Additional Capital Contributions:

Limited Partners (as hereinafter defined), with the consent of the General Partner, may make additional capital contributions on the first calendar day of each calendar month or at other times which the General Partner may determine.

### Allocation of Profits and Losses:

Each Limited Partner in the Partnership and the General Partner will have a Book Capital Account (as hereinafter defined) and a Tax Capital Account (as hereinafter defined), the initial balance of each of which will be the amount contributed to the Partnership by such partner. Any increase or decrease in the Net Asset Value (as defined in the Limited Partnership Agreement) of the Partnership will be allocated among the partners on a monthly basis and will be added to or subtracted from the Book Capital Accounts of the partners in the ratio that each partner's Book Capital Account bears to all partners' Book Capital Accounts, subject to the special allocation provisions of the Limited Partnership Agreement.

### Distributions:

New Profits from realized gains on portfolio investments will be calculated and available for distribution after the payment of the Partnership's expenses and the establishment of necessary reserves. There is no requirement that the Partnership make any such distributions. Any such distributions will be made in the discretion of the General Partner; however, Limited Partners will be entitled to withdraw all or a part of their Interests as described below in the section captioned "Withdrawals" below.

### Incentive Allocation:

At the end of each calendar month, the General Partner will be allotted an Incentive Allocation equal to 20% of the New Profits, if any, achieved with respect to the Book Capital Account of each Limited Partner, appropriately adjusted for any subscriptions, distributions, withdrawals or redemptions in that year (the "Incentive Allocation").

### Fees and Expenses:

Salaries. The Partnership may pay salaries to the personnel of the General Partnership if it is deemed in the best interest of the partnership.

Expenses. Throughout the term of the Partnership, the Partnership shall bear all legal accounting, auditing, regulatory and trading related expenses (including brokerage commissions and custodial fees), transfer and other taxes, due diligence fees and other

**MGMC, LP**

operating expenses (including fees of an investment manager or trader, which may be in the form of salary or profit participation), including telephone costs, duplicating costs, office supplies and other administrative items. The General Partner, in its sole discretion may bear some or all of these costs and expenses.

**Finder's Fee.** The Partnership may, to the extent permitted by law, pay finder's fees to qualified parties that introduce investors to the Partnership.

**Initial Offering and Organizational Expenses.** The General Partner incurred organizational and initial offering expenses. The General Partner may be reimbursed for these costs and expenses by the Partnership. The General Partner plans to cause the Partnership to amortize these expenses over 60 months for accounting purposes.

**Withdrawals:** Upon the close of business on the last business day of each calendar quarter, all or a portion of such Interest may be withdrawn on 30 days' prior written notice to the General Partner, subject to certain restrictions. SEE "SUMMARY OF THE LIMITED PARTNERSHIP – WITHDRAWALS."

**Reports:** At the end of each calendar quarter, the General Partner will prepare and send to each Partner, or make available through an electronic means, an unaudited statement reporting the individual Partner's Capital Account value. In addition, following the end of each fiscal year, audited annual financial statements of the Partnership, certified by the Partnership's independent auditors, shall be prepared and mailed to each Partner. Furthermore, each Partner will receive annual tax information for the preparation of their respective tax returns.

**Risk Factors:** The investment program of the Partnership involves significant risks. The Partnership operates in a high-risk field, and there is limited operating history upon which to evaluate its likely performance. There is no present expectation that a secondary market in the Interests will develop, and there are restrictions on transfers of Interests. Substantial risks are involved in investing in and trading equities. Equities, in which the Partnership invests, are extremely sensitive to corporate announcements and overall market movements. The General Partner may utilize leverage in investing the assets of the Partnership. While this use of leverage may increase the Partnership's overall rate of return, it also may increase losses incurred by the Partnership and the volatility of the Partnerships returns. See "RISK FACTORS."

**Conflicts of Interests:** Certain inherent and potential conflicts of interests exist in the nature and operations of the Partnership. See "CONFLICTS OF INTEREST."

**Additional Information:** Prospective investors desiring further information concerning the terms and conditions of this offering of Interests should contact:

Q-Consolidated Inc., General Partner
Ian Nelms, Client Relations
317-308-8104
Email: ian@qci-us.com

## THE PARTNERSHIP

MGMC Limited Partnership, is a Delaware limited partnership organized in September 2014 under the DELAWARE Revised Uniform Limited Partnership Act, as amended ("Partnership Act"). Q-CONSOLIDATED Inc., a Texas Corporation, has acted as the general partner of the Partnership since its inception. The General Partner manages the affairs of the Partnership pursuant to the provisions of the Partnership's Limited Partnership Agreement (attached hereto as Exhibit A). See "MANAGEMENT OF THE PARTNERSHIP" and "CONFLICTS OF INTEREST."

The principal business office of the General Partner is located at 12723 North Bellwood Drive, Holland, Michigan 49424; its telephone number is 317-308-8104. The Partnership was formed to provide investors with an opportunity to participate in an investment program that seeks capital appreciation by investing in, both liquid and illiquid private equity transactions, collateralized notes, convertible notes, debentures, mid-term notes, hard money, mezzanine debt and any distressed or opportunistic situations to include DIP Financing through investment and trading in Securities and instruments, including purchasing Securities, futures, options both long and selling short, on margin and otherwise. The investment style utilized by the General Partner can be characterized as aggressive. There can be no assurance that the Partnership's investment objective will be achieved. See "INVESTMENT METHODOLOGY" and "RISK FACTORS."

The proceeds of this offering will be applied to the investment objectives of the Partnership. See "SUMMARY OF THE LIMITED PARTNERSHIP AGREEMENT."

Subscribers whose subscriptions are accepted will become limited partners of the Partnership ("Limited Partners").

## OFFERING OF INTERESTS

Interests may be purchased as of the beginning of business on the first calendar day of each calendar month. The amount of each investor's subscription will be contributed to the Partnership upon the acceptance of the subscription by the General Partner. If a subscription for an Interest is rejected in whole or in part (which is in the sole discretion of the General Partner), the rejected subscription funds or the rejected portion thereof will be returned to the subscriber, within 30 days of the General Partner's receipt of the subscription, without deduction or interest thereon. The General Partner, in its sole discretion, will determine whether to accept or reject a subscription as promptly as possible following its receipt.

### Suitability Requirements.

The General Partner may reject any subscription for an Interest, in whole or in part, for any reason. There is no maximum amount of capital contributions that may be accepted by the Partnership pursuant to this offering of Interests. Participation in the Partnership pursuant to this offering of Interests is limited to investors who, either alone or in conjunction with their

**MGMC, LP**

respective purchaser representative(s) (as defined in Regulation D), are qualified to invest in the Partnership by (a) their knowledge and acceptance of the risks associated with leveraged trading in volatile markets, and (b) their financial ability to accept such risks. Interests which are offered hereby should only be purchased by those persons who can afford the possible loss of their entire investment and may only be purchased by those investors who represent and warrant that they are purchasing the Interests for their own account for investment purposes without any present intention to resell, distribute or otherwise transfer or dispose of the Interests and who meet the definition of an "accredited investor" as defined by Rule 501 under Regulation D promulgated under the Securities Act:

### WHO MAY INVEST - SUITABILITY STANDARDS

We will sell the Interests only to "accredited investors" as defined by Rule 501 under Regulation D promulgated under the Securities Act. Accordingly, each purchaser of the Interests will be required to represent and establish in writing, among other things, whether or not such purchaser is an accredited investor.

The Interests are being offered by us in reliance on an exemption from registration under the Securities Act of 1933, as amended (the "Securities Act"), and the securities or blue-sky laws of each jurisdiction in which the Interests are being offered. Each prospective investor will be required to represent that the Interests are being acquired solely for the prospective investor's own account, for investment purposes only, and not with a view to its distribution within the meaning of Section 2(11) of the Securities Act.

All prospective investors also will be required to make certain representations to the Partnership prior to investing in the Interests, which the Partnership will rely upon as to the prospective investor's understanding of this investment and their financial capabilities. Each investor will be required to submit a signed Subscription Agreement, which, among other things, will require the investor, as a purchaser of the Interests, to indemnify the Partnership and related parties for any liabilities arising out of any misrepresentations made in the Subscription Agreement by the investor.

Prospective investors may be required to provide us with evidence that we deem necessary to substantiate the accuracy of the prospective investor's representations. We reserve the right to make our own judgment as to whether any prospective investor is an accredited investor.

**In general, in order to qualify as an "accredited investor", a prospective investor must fall into one of the following categories:**

- A bank, or any savings and loan association or other institution (as defined in the Securities Act);
- a broker or dealer registered under of the Securities Exchange Act of 1934;
- an insurance company (as defined in the Securities Act);

Page 10

- an investment company registered under the Investment Company Act of 1940;
- a business development company (as defined in the Securities Act); any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958;
- any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000;
- any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;
- a private business development company under the Investment Advisers Act of 1940;
- a corporation, an organization qualified under Section 501(c)(3) of the Internal Revenue Code, a Massachusetts or similar business trust, or a limited partnership with total assets in excess of $5,000,000, not formed for the specific purpose of investing in the Company;
- a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Interests;
- a natural person whose individual net worth, or joint net worth with such person's spouse, at the time of purchase exceeds $1,000,000, for purposes hereof "net worth" means the excess of total assets at fair market value (including personal and real property, but excluding the estimated fair market value of a person's primary home) over total liabilities. Total liabilities excludes any mortgage on the primary home in an amount of up to the home's estimated fair market value as long as the mortgage was incurred more than 60 days before the Interests are purchased, but includes (i) any mortgage amount in excess of the home's fair market value and (ii) any mortgage amount that was borrowed during the 60-day period before the closing date of the sale of Interests for the purpose of investing in the Interests;
- a natural person whose individual income (excluding spousal income) exceeded $200,000 in the two most recent years and has a reasonable expectation of reaching the same income level in the current year. For purposes hereof, " income" means annual adjusted gross income, as reported for federal income tax purposes, plus (i) the amount of any tax-exempt interest income received; (ii) the amount of losses claimed as a limited partner in a limited partnership; (iii) any deduction claimed for depletion; (iv) amounts contributed to an IRA or Keogh retirement plan; (v) alimony paid; and (vi) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Internal Revenue Code of 1986, as amended;
- a natural person whose joint income (including spousal income) exceeded $300,000 in the two most recent years and has a reasonable expectation of reaching the same joint income level in the current year. For purposes hereof, " income" means annual adjusted gross income, as reported for federal income tax purposes, plus (i) the amount of any tax-exempt interest income received; (ii) the amount of losses claimed as a limited partner in a limited partnership; (iii) any deduction claimed for depletion; (iv) amounts contributed to an IRA or Keogh retirement plan; (v) alimony paid; and (vi) any amount by which income from long-

MGMC, LP

term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Internal Revenue Code of 1986, as amended;

- any other entity (e.g., a corporation, partnership, limited liability company, trust, etc.) in which all of the equity owners are accredited investors.

These above-described suitability standards are minimum requirements for accredited investors, and the satisfaction of these standards does not necessarily mean that the Interests are a suitable investment for a particular prospective investor or that the subscription from a prospective investor who meets or exceeds the minimum requirements will be accepted by the Partnership. In deciding whether to accept or reject a subscription from a person satisfying these minimum suitability standards, the Partnership can consider whatever other factors it deems appropriate, and it has the absolute discretion to reject any subscription for any reason whatsoever.

**Prospective investors shall be personally responsible for determining whether an investment in the Interests is suitable for him or her. Each prospective investor is strongly urged to obtain the advice of an attorney, tax consultant, accountant, and business advisor with respect to the legal, tax, business, accounting, financial, and related aspects of this investment prior to subscribing for these securities.**

**This Memorandum does not offer to sell or solicit an offer to buy the Interests from any person who does not meet the suitability standards described in this Memorandum and in the Subscription Agreement. If you do not satisfy each of the suitability standards described in this Memorandum and in the Subscription Agreement, we request that you immediately return this Memorandum and all related materials to us.**

## *Transferability*

Prospective investors should note that Interests are not freely transferable. A registration statement covering the Interests has not been filed with the Securities and Exchange Commission under the Act, and no such registration of the Interests by the Partnership is contemplated as of the date of this Memorandum. The Act would prohibit transfer or sale of the Interests in the absence of such registration unless an exemption to the Act's registration requirements was applicable to such transfer or sale. In addition, the prior consent of the General Partner is required for the transfer of any Interests.

## *Capital Contributions*

Capital Contributions must be made in cash via a check or a wire in U.S. dollars.

## *Purchase Procedure*

In order to subscribe for an Interest, an investor must complete, execute and date a Subscription Agreement/Power of Attorney and deliver or mail such document to Q-Consolidated, Inc., P.O. Box 414 Zeeland, Michigan 49464, Telephone: 317-308-8104 Email: compliance@qci-us.com.

Contributions should be made by check or electronic wire transfer. Investors who wish to pay by electronic wire transfer should wire such funds to:

| | |
|---|---|
| Beneficiary's Name: | **MGMC LP** |
| Account Number: | 8095089293 |
| Beneficiary's Bank: | Bank of Texas |
| ABA #: | 111014325 |
| Bank address: | 5909 Camp Bowie Blvd, Forth Worth, Texas 76107 |
| Bank Phone: | 817-348-5740 |

Investors who designate one or more purchaser representatives to assist them in evaluating the merits and risks of an investment in the Partnership also must complete and deliver to the General Partner certain purchaser representative documentation which may be obtained from the General Partner.

MGMC, LP

# INVESTMENT METHODOLOGY

All investment decisions will be made exclusively by the General Partner, in its sole and absolute discretion. The General Partner will be free to pursue such investment strategies, as it deems fit or appropriate at any given time. Moreover, the General Partner may change, in its absolute discretion, the investment objectives and policies of the Partnership and there can be no assurance that it will not exercise such power. The following discussion of investment strategy is intended only to provide an overview of potential strategies which may be used by the Partnership but which are subject to change as market conditions may warrant.

### Objective and General Approach

The Partnership's investment objective is to seek capital appreciation by investing in, public and private equity offerings, commercial credit, real estate investments, distressed assets, equities, exchange traded funds, options, futures, currency and other securities and financial instruments. The firm pursues situations where it can readily identify value creation in a predictable time frame and where its core competencies and competitive advantages translate into sustainable and attractive risk-adjusted returns.

The credit strategy includes Corporate Securities, Private Placement, Debentures, MTN's (medium term notes), Loan Portfolios and Special Opportunities in developed and emerging markets. The Real Estate strategy includes value-add and income-oriented commercial real estate investments, as well as real estate loan transactions. By conducting bottom-up analysis that includes fundamental credit analysis, advanced commercial real estate valuation and proven pricing models supported by modern portfolio theory, the investment manager uncovers the true intrinsic value of an investment, thereby seeing opportunities where others see only risk. It is the intent of the General Partner to maintain a diverse balanced investment portfolio.

### Investment Authority and Restrictions

The Partnership has broad authority under the Partnership Agreement to acquire, purchase, invest in, hold for investment, own, exchange, assign, sell or otherwise dispose of, trade in, on margin or otherwise, sell short, lend, lease, mortgage, pledge or otherwise deal in "Securities" (as hereinafter defined). The Partnership may employ an aggressive investment policy and utilize sophisticated trading techniques such as, but not limited to, selling short, borrowing money for the purchase of securities, and purchasing and selling put and call options (or combinations thereof), and may also make more conservative investments, including, but not limited to, investment in cash, deposit accounts and cash equivalents, as and when determined appropriate by the General Partner.

The term "Security" and "Securities" shall mean all types of domestic and foreign corporate and governmental securities, publicly traded, free-trading, including preferred stocks, common

Case 1:21-cv-00495 ECF No. 1-3, PageID.59 Filed 06/11/21 Page 17 of 57
Case 3:22-mc-00020-L-BH Document 2-3 Filed 03/18/22 Page 60 of 100 PageID 84

MGMC, LP

stocks, subscriptions, warrants, bonds, notes, debentures and other debt instruments (whether or not subordinated, convertible or otherwise and whether or not such instruments, such as loans, would be deemed "securities" within the meaning of the Federal securities laws), investment company securities, limited partnership interests, puts, calls, straddles, indices, options, currencies, any certificates, receipts, forward or spot contracts, repurchase agreements or other instruments representing rights to receive, purchase subscribe for or sell any of the foregoing, or representing any other rights or interests therein or in any property or assets created or issued by any foreign or domestic persons, firms, associations, corporations, or governments, agencies or subdivisions thereof, and futures contracts and options of all types, financial and currency options and other securities of whatever kind or nature, publicly traded, of any domestic or foreign corporation, partnership, government or entity whatsoever.

### Leveraged Purchase of Securities

The General Partner expects to utilize leverage when it deems that it is in the best interest of the Partnership. Borrowing money to purchase instruments may provide the Partnership's portfolio with the opportunity for greater capital appreciation but at the same time will increase the portfolio's risk of loss with respect to that instrument. Although leverage increases returns to the Partnership if it earns a greater return on the incremental investments purchased with the borrowed funds than it pays for such funds, the use of leverage decreases returns to the Partnership if it fails to earn as much on such incremental investments as it pays for such funds.

### Short Sales

The General Partner will utilize "short sales," strategies to take advantage of market volatility. The General Partner will also effect a short sale in an exchange-traded fund as a hedge to the Partnership's portfolio. A short sale is effected by selling a security which the Partnership does not own or, if the Partnership does own the security, which is not to be delivered upon consummation of the sale. The General Partner may engage in "naked" short sales, i.e., short sales of securities the Partnership does not own. If the price of the security in the naked short sale decreases, the Partnership will profit to the extent that the short sale price for the security exceeds the market price, less transaction costs. In the event the price of the security increases, the Partnership will incur a loss to the extent that the market price exceeds the short sale price plus transaction costs.

### Options

The Partnership will actively utilize various option strategies, including purchasing and selling calls and/or puts, vertical and horizontal spreading, and naked and covered writing for appreciation and as a hedge in the Partnership's portfolio. As transactions vary in characteristics, so will the appropriate options strategy for a given situation. For example, writing a covered option may make sense to the General Partner in one situation, and not another. Hedging in options may reduce the risks of both short selling and taking long positions in certain transactions.

MGMC, LP

### Holding Period and Turnover

The General Partner expects to engage in substantive trading as a result of what the General Partner deems appropriate that will result in the Partnership experiencing significant turnover and transaction costs and these costs will be borne by the Partnership regardless of its profitability. Although the General Partner may believe that such trading may yield a greater return through the use of incremental investments, the additional transactions costs will decrease returns and may cause the Partnership to suffer losses if such trading fails to yield a greater return than that of the transactions costs on the incremental investments.

### Cash and Cash Equivalents

The Partnership reserves the right to maintain significant amounts in cash, particularly when the General Partner believes the Partnership should follow a temporary defensive posture, or when the General Partner determines that opportunities for investing are unattractive. Among the cash equivalents which the Partnership may acquire are: obligations of the United States Government, its agencies or instrumentalities; commercial paper, certificates of deposit and bankers' acceptances issued by domestic branches of U.S. banks that are members of the Bank Insurance Fund. The Partnership also may enter into repurchase or reverse repurchase agreements, may purchase shares of money market mutual funds properly registered under the securities laws, and may receive interest paid on its credit balances with securities firms or others. There is no restriction on the amount of time that Partnership funds may be held prior to being utilized. All funds will be received in the name of the Partnership, and funds held as margin deposits will be properly segregated in accordance with applicable regulations.

### Diversification and Concentration

The Partnership Agreement imposes no limits on the concentration or lack of diversity of the Partnership's investments in particular securities, industries, or sectors. As a result, the level of diversification may be lower than a well-diversified portfolio.

### Inherent Risks

An investment in the Partnership should be viewed as a speculative investment. It is not intended as a complete investment program and is designed only for investors who have adequate means of providing for their needs and contingencies without relying on distributions or withdrawals from their Partnership accounts, who are financially able to maintain their investment and who can afford the loss of their investment. There can be no assurance that the Partnership will achieve its investment objectives. All potential investors in the Partnership should understand the investment approaches and techniques that the General Partner expects to use in the management of the Partnership and the particular risks associated with those approaches and techniques. See "RISK FACTORS."

## MANAGEMENT OF THE PARTNERSHIP

MGMC Limited Partnership is a Delaware limited partnership formed in September 2014. The General Partner of the Partnership is Q-CONSOLIDATED, LLC, a Delaware Limited Liability Company.

The General Partner will make all the investment decisions for the Partnership. The General Partner will administer the affairs of the Partnership, coordinating and administering all financial activities, including preparation of tax returns, financial statements, and, to the extent deemed advisable or appropriate by the General Partner, special financial reports and quarterly statements to Limited Partners. The General Partner has unlimited authority to administer the financial activities of the Partnership.

A major factor in an Investor's decision to invest in the Partnership is the Investor's opinion of the Investment Manager of the General Partner.  H. D. Biddle (Manager) is the Manager of Q-CONSOLIDATED INC, which supervises the Partnership's operation including portfolio management, selection of investment vehicles, allocation, administrative functions and investor relations.

### *TO BE DETERMINED*

PROFESSIONAL EXPERIENCE:

Insert H D Bio and Info -

The General Partner may employ additional personnel in the future.

There have never been any material administrative, civil or criminal actions, suits or proceedings brought against the General Partner.

MGMC, LP

## INCENTIVE ALLOCATION

At the end of each calendar month, the General Partner will be allotted an Incentive Allocation equal to 20% of the New Profits, if any, achieved with respect to the Book Capital Account of each Limited Partner, appropriately adjusted for any subscriptions, distributions, withdrawals or redemptions in that year (the "Incentive Allocation").

If a Limited Partner experiences net losses following the allocation of an Incentive Allocation to the General Partner, the General Partner will retain all incentives previously allocated, but no further Incentive Allocations will be charged to the Limited Partner until additional New Profits are achieved.

"New Profits" are the increase in a Limited Partner's Book Capital Account over the Limited Partner's highest prior Book Capital Account ("Maximum Capital Account") from which a share of New Profits was allocated to the General Partner, as adjusted for such prior allocation. With respect to the first Incentive Allocation, New Profits shall mean the increase in a Limited Partner's Book Capital Account over the Limited Partner's Opening Book Capital Account for the first Fiscal Year in which such Limited Partner owns an Interest.  The Maximum Capital Account and Opening Book Capital Account (for the first Incentive Allocation made with respect to a Limited Partner's Capital Account) will be adjusted for contributions and withdrawals.

See "CONFLICTS OF INTEREST."

MGMC, LP

### Summary of Fees and Expenses

### Salaries

The Partnership may pay salary to the personnel of the General Partnership if it deemed in the best interest of the partnership.

### Initial Offering and Organizational Expenses

The General Partner incurred organizational and initial offering expenses. The General Partner will be reimbursed by the Partnership for these costs and expenses from the Partnership. The General Partner plans to cause the Partnership to amortize these expenses over 60 months for accounting purposes.

### Finder's Fees

The Partnership may pay finder's fees to qualified parties that introduce investors to the Partnership.

### Other Expenses

The Partnership will be obligated to pay other annual operating expenses on an ongoing basis, including periodic legal, accounting, filing, bookkeeping, auditing, regulatory and trading related expenses (including brokerage commissions and custodial fees), transfer and other taxes, due diligence fees and other operating expenses, including telephone costs, duplicating costs, office supplies and other administrative items. The General Partner or General Partner, in its sole discretion, may bear some or all of these costs and expenses. See "SUMMARY OF THE LIMITED PARTNERSHIP AGREEMENT" and "CONFLICTS OF INTERESTS."

MGMC, LP

## TAX CONSIDERATIONS

The following is a summary of certain federal income tax consequences of an investment in the Partnership. This summary is limited to the consequences to a Partner that is a U.S. Person (as defined below) and focuses primarily on the consequences to Partners that are individuals or trusts.

The summary does not address all aspects of taxation that may be relevant to a particular Partner in light of the Partner's particular tax circumstances or to certain types of investors subject to special rules under the federal income tax laws, such as regulated investment companies, banks, insurance companies, personal holding companies, tax-exempt entities, charitable remainder trusts, charitable lead trusts, and dealers in securities. *Each prospective Partner should consult such person's own tax adviser as to the specific tax consequences of an investment in the Partnership, including the application and effect of state and local income and other tax laws.*

A "U.S. Person" means a Partner who or that is, for federal income tax purposes, a citizen or resident of the United States, a corporation organized in or under the laws of the United States, any state or the District of Columbia, or any other person subject to federal income taxation on a net basis with respect to Non-Manager Partner Interests of the Partnership.

The following summary is based on existing provisions of the Internal Revenue Code ("Code"), existing and proposed Treasury Regulations, and existing administrative interpretations and court decisions. Future legislation, Treasury Regulations, administrative interpretations or court decisions could significantly change the treatment of the items discussed. Any such change could have retroactive application and, therefore, could alter the tax consequences to a Partner of his or her investment in the Partnership.

The Code contains a number of ambiguities that will be resolved only by future legislative, administrative or court action. In addition, on certain questions there are no relevant Treasury Regulations, administrative interpretations or controlling court decisions. Accordingly, no assurance can be given that the Internal Revenue Service (the "IRS") will not challenge the tax treatment of certain matters discussed herein or, if it does, that it will not be successful. No rulings have been requested or received from the IRS as to any of the matters discussed herein.

THIS SUMMARY IS NOT INTENDED AS A SUBSTITUTE FOR CAREFUL TAX PLANNING. NEITHER THE GENERAL PARTNER, THE PARTNERSHIP, NOR ANY OF THEIR COUNSEL OR CONSULTANTS ASSUMES ANY RESPONSIBILITY FOR THE TAX CONSEQUENCES OF THIS TRANSACTION TO ANY LIMITED PARTNER. EACH SUBSCRIBER WILL BE REQUIRED TO REPRESENT IN THE SUBSCRIBER'S SUBSCRIPTION AGREEMENT THAT SUCH SUBSCRIBER HAS RELIED ONLY ON THE SUBSCRIBER'S OWN TAX ADVISOR WITH RESPECT TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES ARISING FROM THE PURCHASE.

Case 1:21-cv-00495  ECF No. 1-3, PageID.65  Filed 06/11/21  Page 23 of 57
Case 3:22-mc-00020-L-BH    Document 2-3    Filed 03/18/22    Page 66 of 100    PageID 90

MGMC, LP

## Classification as a Partnership

The General Partner believes the Partnership will be classified as a partnership for federal income tax purposes and not as a publicly traded partnership or an association taxable as a corporation, and each Partner will be treated as a partner in the Partnership for federal income tax purposes.

## Capital Accounts; Tax Basis in the Interests

The Partnership will maintain a Capital Account for each Partner. The initial balance of each Capital Account will equal the amount of cash the Partner contributes to the Partnership, decreased by the amount of offering expenses allocated to such Partner, if any. Thereafter, each Partner's Capital Account will be (i) increased to reflect the amount of such Partner's share of the Partnership's income or the amount of any additional cash contributed by such Partner, and (ii) decreased to reflect the amount of any cash distributed to such Partner and such Partner's share of the Partnership's losses and expenses.

A Partner's initial tax basis in his or her Interests will equal the cash contributed by such Partner to the Partnership, plus the Partner's share of the Partnership's nonrecourse liabilities, if any. A Partner's tax basis in his or her Interests will be increased by (i) the Partner's share of the Partnership's taxable income, including capital gain, (ii) the Partner's share of the Partnership's income, if any, that is exempt from tax, and (iii) any increase in the Partner's share of the Partnership's nonrecourse liabilities. A Partner's tax basis in his or her Interests will be decreased (but not below zero) by (i) the amount of any cash of the Partnership that is distributed to the Partner, (ii) the Partner's share of the Partnership's losses and deductions, (iii) any decrease in the Partner's share of the Partnership's nonrecourse liabilities, and (iv) the Partner's share of the Partnership's expenditures that are neither deductible nor properly chargeable to the Capital Account.

## Allocation of Taxable Income or Loss from Securities

Generally, all items of taxable income or loss of the Partnership will be allocated to the Partners pro rata in accordance with their percentage interest in the Partnership. Gains or losses on the sale of securities would be capital gains or losses. Long-term capital gains and losses allocated to non-corporate Partners with respect to sales of securities will be subject to a maximum federal income tax rate of 20% for securities held longer than 12 months, while other income allocated to such Partners in connection with the Partnership's holding of securities may be subject to the maximum federal rate.

## Limitations on Deductibility of Partnership Losses

The amount of Partnership loss, including capital loss, which a Limited Partner will be entitled to take into account for federal income tax purposes is generally limited to the tax basis of the Limited Partner's Interests (or, in the case of certain Limited Partners, including individuals and

**MGMC, LP**

certain closely-held C corporations, the amounts for which the Limited Partner is "at risk" if a lesser amount) as of the end of the Partnership's taxable year in which such loss occurred.

The amount for which a Limited Partner is "at-risk" with respect to his interest in the Partnership is generally equal to such Limited Partner's tax basis for such interest, less: (1) any amounts borrowed in connection with his acquisition of such interest for which he is not personally liable and for which he has pledged no property other than such interest; (ii) any amounts borrowed from persons who have a proprietary interest in the Partnership; and (iii) any amounts borrowed for which such Limited Partner is protected against loss through guarantees or similar arrangements. A Limited Partner is not at risk for his share of the Partnership's nonrecourse debt.

### Passive Loss Rules

In the case of individuals and certain closely held C corporations, the Code restricts the deductibility of loss from a "passive activity" against certain income, which is not derived from a passive activity. The trading of personal property of a type that is actively traded, such as certain securities, will not be treated as a passive activity for purposes of the passive loss rules. Accordingly, for such individuals or closely-held C corporations, a Limited Partner's distributive share of items of income, gain, deduction, or loss from the Partnership's trading of such property will generally not be treated as passive income or loss, and Partnership gains attributable to such property and allocable to such Limited Partners will not be available to offset passive losses from sources outside the Partnership. However, income or loss attributable to property that is not actively traded, such as real estate, may constitute passive activity income or loss. In this regard, certain of the assets which the Partnership intends to trade or acquire may not be "actively traded" for these purposes.

### Partners Distributive Shares

Under Section 704(b) of the Code, a Partner's distributive share of income, gain, loss, deduction or credit (or any item thereof) of the Partnership will be determined in accordance with the Limited Partnership Agreement only if that allocation under the Agreement has "substantial economic effect."

In determining whether an allocation has substantial economic effect, the principal considerations are (i) whether the allocation actually affects the eventual amount of money or other property allocable to a Partner (i.e., it has economic effect), without regard to tax consequences, and (ii) whether the effect described in (i) is substantial. If an allocation under the Limited Partnership Agreement does not have substantial economic effect, the IRS will reallocate profits and losses among the Partners in accordance with their interests in the Partnership, determined by taking into consideration all facts and circumstances. The allocations of profits and losses under the Limited Partnership Agreement should have economic effect and that effect should be "substantial" as that term is defined in the Treasury Regulations. The allocations should have economic effect under the alternative test for

Case 1:21-cv-00495 ECF No. 1-3, PageID.67 Filed 06/11/21 Page 25 of 57
Case 3:22-mc-00020-L-BH Document 2-3 Filed 03/18/22 Page 68 of 100 PageID 92

MGMC, LP

economic effect set forth in the Treasury Regulations because (i) capital accounts will be maintained in accordance with the standards as set forth in the Treasury Regulations and (ii) distributions upon liquidation will be made in accordance with positive Capital Account balances, as required by the Treasury Regulations.

### Distributions and Withdrawals/Redemption

Pursuant to Section 731 of the Code, distributions of cash with respect to a Partner's Interests are taxable only to the extent the amount of cash exceeds the Partner's tax basis in his or her Interests. A Partner's adjusted tax basis in his or her Interests is determined as described above in "Capital Accounts; Tax Basis in the Interests." Gain, if any, resulting from cash distributions will be treated as a gain from the sale or exchange of the Partner's Interests.

The tax rate on the withdrawal of an Interest will depend on several factors. If a Partner withdraws his Interest more than one year after its purchase, generally that should result in long-term capital gain or loss. The amount of gain which the Partner must recognize on the withdrawal of an Interest will be the cash the Partner receives, less the adjusted tax basis in the Interest. Such taxable gain is characterized by allocating the gain among the assets of the Partnership. Generally, gain or loss recognized by the Partner on the withdrawal of an Interest will be taxable as capital gain or loss.

Currently, the holding period required for long-term capital gain treatment is more than twelve (12) months in order to qualify a gain for an effective maximum tax rate of 20%. For Interests acquired after 1999 and held more than five (5) years, an even lower capital gains rate may apply. Capital assets sold at a profit within twelve (12) months of purchase would result in short-term capital gain, which is taxed at ordinary income rates. Any gain or loss, however, will be separately computed and may be taxed as ordinary income or loss under Section 751 of the Code, which applies to any assets of the Partnership which generate ordinary income upon withdrawal and any unrealized receivables of the Partnership. It is possible that a portion of the gain from the withdrawal of a Partner's Interests may be characterized as ordinary income rather than capital gain. Any loss recognized on the withdrawal of Interests will generally be a capital loss. Net capital loss may offset no more than $3,000 of ordinary income in the case of individuals and may only be used to offset capital gain in the case of a corporation.

### Partnership's Liquidation

Upon the Partnership's liquidation, any gain or loss recognized from a distribution to the Partners generally will be considered as gain or loss from the sale or exchange of a capital asset, except to the extent Section 751 of the Code applies. A Partner must recognize gain on any distribution to the extent that any money received, together with any reduction in the Partner's share of Partnership debt, exceeds the Partner's adjusted basis in his or her Interests. A Partner will not recognize a loss unless he or she receives no property in the distribution other than money, unrealized receivables or inventory items and then only to the extent that the money

MGMC, LP

and the basis to the Partner of the unrealized receivables and inventory are less that the Partner's adjusted basis in his or her Interests.

## Portfolio Management Strategies

As described above, the General Partner may employ various investment techniques intended to enhance the Partnership's returns and to protect against the risk of decline with respect to one or more securities or positions in the portfolios of the Partnership. The Partnership is generally required to recognize gain in connection with a constructive sale transaction entered into with respect to an appreciated financial position held by the Partnership. Transactions treated as constructive sales include covered short sales of, offsetting notional principal contracts with respect to, or futures or forward contracts to deliver, the same or substantially identical property. Other types of transactions that have substantially the same effect as a transaction described in the preceding sentence may also be treated as constructive sales pursuant to Treasury Regulations to be issued.

Except as described in the following sentence, if the Partnership were to enter into a constructive sale, the Partnership would recognize gain as if the appreciated financial position were sold and immediately repurchased, with an appropriate increase in the position's basis and the start of a new holding period. If the Partnership closes out a transaction treated as a constructive sale within thirty (30) days after the end of its taxable year, gain would not be recognized on the underlying appreciated financial position if (i) the appreciated financial position is held for at least the next sixty (60) days after the constructive sale is closed and (ii) at no time during such sixty (60) day period is the Partnership's risk of loss with respect to such position reduced by holding certain other positions.

The tax consequences of the Partnership's investment techniques will depend upon its particular terms, and such transactions may result in gain, loss or other income or deductions to the Partnership at various times. The character of income, gain or loss as ordinary or capital may vary with the type of transaction. In general, periodic amounts payable by the Partnership in connection with interest rate swaps, caps, floors and collars, and certain other investment techniques likely would be considered "miscellaneous itemized deductions" which, for a non-corporate Partner, will be subject to restrictions on their deductibility. See "Deductibility of the Partnership's Expenses" below. In some cases, the tax rules applicable to portfolio management transactions that may be employed by the Partnership are uncertain and such transactions might, under certain circumstances, affect the tax treatment of a Partner's unrelated securities transactions.

## Interest Expense

Should the Partnership incur any interest expense in connection with its trading activities, or should a Partner incur interest expense in borrowing funds to make an investment in the Partnership, Partners who do not materially participate in the Partnership's activities will have the ability to deduct such interest, limited to the amount of the Partner's net investment income.

Case 1:21-cv-00495 ECF No. 1-3, PageID.69 Filed 06/11/21 Page 27 of 57
Case 3:22-mc-00020-L-BH Document 2-3 Filed 03/18/22 Page 70 of 100 PageID 94

MGMC, LP

It is likely that the Partnership's interest expense will need to be separately stated to such Partners. Any investment interest disallowed as a deduction in a taxable year of a Partner solely by reason of the limitation above is treated as investment interest paid or accrued in the succeeding taxable year.

As stated above, the deductibility of a Partner's investment interest expense generally is limited to the amount of his or her net investment income. Investment interest expense includes interest on indebtedness incurred or continued to purchase or carry property held for investment. Under the Treasury Regulations, debt of a taxpayer generally is allocated among the taxpayer's activities by tracing the proceeds of such debt. A detailed discussion of the tracing rules contained in the Treasury Regulations is beyond the scope of this discussion. Consequently, if a Partner intends to finance the purchase or his or her Interests with borrowed funds, the Partner should consult his or her own tax advisors before borrowing such funds and should maintain careful records of any debt the General Partner incurs to carry or acquire the Interests.

Net investment income includes gross income from property held for investment and gain attributable to the disposition of property held for investment. Net capital gain attributable to the disposition of property held for investment is excluded from investment income for purposes of computing the investment income limitation, although the Partner may elect to include the net capital gain in investment income if he or she reduces the net capital gain (eligible for the applicable capital gains tax rate) by the same amount.

### Tax Treatment of Partnership Operations

It is anticipated that the Partnership will continue to report its operations on a calendar year basis and the General Partner will have the discretion to determine the accounting method. Under the Code, the Partnership will be required to report its operations on a taxable year corresponding to the tax year of its Partners owning a majority of the Partnership's profits and capital.

Regarding the method of accounting for the Partnership, the books and records of the Partnership will be kept on the accrual method of accounting, as determined by the General Partner and under the Code and Treasury Regulations.

The accounting method chosen governs the timing of income and deductions (e.g., when an item of income is included or expense deducted). The characterization of income items as capital or ordinary and the deductibility of expenses or losses are determined under other provisions of the Code, which are discussed throughout this Memorandum. A Partner's share of the income or losses will be recognized by the Partner regardless of whether the Partnership distributes any cash to the Partner.

MGMC, LP

### Mark to Market 475(f) Election

The Partnership will use mark-to-market accounting. Mark-to-market accounting converts capital gains and losses to ordinary gains and losses, so there is no limit on the amount of losses that can be deducted (there is a $3,000 limit on capital losses). Under mark-to-market accounting the Partnership will also be exempt from wash sale rules.

### U.S. Federal Taxation of Partners-Traders versus Investors

A determination of whether or not the Partnership is engaged solely in investing and/or trading securities and other financial instruments for its own account is of critical importance for tax purposes. Unfortunately, there is no statutory definition of trade or business. Ultimately, this determination is a question of fact, although case law does provide some guidance. Based upon the relevant case law the indicia of a "trader" are: (1) predominant intent to earn a profit from the short-term market swings of securities by buying and selling securities frequently, (2) trading activities are continuous, regular and extensive, (3) vast majority of income is derived from short-term trading (as distinguished from dividends, interest, and long-term capital gain), (4) significant use of short term buying and selling of securities, margin purchases, borrowing to finance purchases, hedging transactions, short sales, put or call options, commodity transactions, stock lending, conversions and reverse conversions in order to manipulate security holdings in an attempt to produce the best possible return. While these criteria provide guidelines for determining trader versus investor status, the test is based solely on the facts and circumstances of the Partnership.

The determination of trader versus investor will directly impact how Partners will be taxed on their respective distributive share of partnership income, deduction, gain, and loss. For example if under federal and state and local tax law, the Partnership's activities do not constitute a trade or business, the Partnership's operating expenses will be characterized as investment expenses. For an individual, for federal tax purposes, this means that the Partnership's expenses will only be deductible as miscellaneous itemized deductions to the extent that they exceed 2 percent of such partner's adjusted gross income (as opposed to being fully deductible if the partnership were deemed to be engaged in a trade or business). For Federal purposes, interest expenses may be limited even further under the alternative minimum tax.

### Tax Reporting by the Partnership

The Partnership will file annually a federal partnership information return but will not be subject to federal income tax liability. Each Partner will be required to report on his or her own federal income tax return his or her allocable share of the Partnership's income, gains, losses, deductions and other tax items as well as any gain that the Partner may be required to recognize in respect of cash distributions. Each Partner will include his or her share of the Partnership's taxable income for the Partnership's full taxable year that ends within or with the Partner's taxable year, even if no cash is distributed to such Partner. Thus, a Partner's share of taxable income of the Partnership for any year may exceed the cash actually distributed to such

Partner in such year. It is expected that each Partnership's taxable year will be the calendar year.

The Partnership will furnish annually to each Partner a report of such Partner's distributive share for such year of taxable income or loss and other tax items for use in the preparation of the Partner's own federal income tax return.

Federal and state estimated income tax payments may be required by a Partner subject to taxation on the Partnership's allocations and distributions attributable to his or her Interests. Each Partner will be responsible for ensuring that the said estimated tax payments are properly made. Each Partner should consult with his or her tax advisor concerning the computation and timing of such payments.

## Tax Exempt Organizations

Organizations generally exempt from federal income taxation under Section 501(a) of the Code (including qualified pension, profit-sharing and stock-bonus plans, Keogh plans and individual retirement accounts (IRAs) may, nevertheless, be taxable on their allocable share of income to the extent such income constitutes "unrelated business taxable income" ("UBTI"). A charitable remainder trust, although not a tax-exempt organization is also subject to income taxation on UBTI.

A tax-exempt organization will be required to recognize UBTI based on its unrelated business income, which generally is equal to the gross income derived by the tax-exempt organization from all trades or businesses not related to the organization's tax-exempt purpose (including income derived through ownership by the tax-exempt entity of an Interest in the Partnership), less deductions directly connected with such gross income.

The Partnership intends to use margin debt to finance certain investments. Therefore, it is likely that interest and dividend income of the Partnership allocated to Partners subject to the UBTI rules will be subject to such tax and the gains the Partnership recognizes from selling stock or Securities allocated to Partners subject to the UBTI rules will also be subject to such tax.

## Foreign Investors

A Limited Partner who is a nonresident alien individual, foreign corporation, foreign partnership, foreign trust or foreign estate (a "Foreign Person") generally is not subject to taxation by the United States on United States source capital gains from trading in capital assets for a taxable year, provided that such Foreign Person is not engaged in a trade or business within the United States during its taxable year, and provided further that such Foreign Person, in the case of an individual, does not spend more than 182 days in the United States during its taxable year. A Foreign Person is not subject to United States tax on certain original issue discount and certain interest income from United States sources provided that such Foreign Person is not engaged in a trade or business within the United States during such taxable year. However, a Foreign Person is generally subject to United States tax on United States source

MGMC, LP

dividend income. As explained below, an investment in the Partnership could cause a Foreign Person to be engaged in a trade or business within the United States for the foregoing purposes if the Partnership is so engaged. If a Foreign Person is engaged in a trade or business within the United States during a taxable year by reason of owning an Interest, such Foreign Person will be required to file a United States income tax return for such year and pay tax at regular United States rates on its net income which is effectively connected with the trade or business conducted within the United States.

If the Partnership is considered to be engaged in a trade or business within the United States, a Foreign Person which is a Limited Partner would also be considered to be so engaged. In this connection, Treasury regulations provide a general rule that a Foreign Person will not be considered engaged in a trade or business within the United States solely on account of granting the Partnership discretion to effect stock, security or certain exchange traded commodity transactions for the account of the Partnership. The rule, however, is not available to a Foreign Person which is a dealer in stocks, securities or commodities. Because the Partnership has its principal office in the United States, the rule is also not available if the principal business of the Partnership is trading in stocks or securities. Whether a taxpayer such as the Partnership would be considered to be so engaged in the principal business of trading in stocks or securities or engaged in a trade or business within the United States is a question of fact for which no clear answer is available. Consequently, there is a risk that a Foreign Person's allocable share of income of the Partnership will be treated as effectively connected with the conduct of a United States trade or business and therefore subject to United States Federal income tax at regular rates of tax and, in the case of a Foreign Person which is a foreign corporation, an additional 30% branch profits tax.

If the Partnership has taxable income in any year which is effectively connected with the conduct of a trade or business within the United States, the Partnership will be required to pay a withholding tax with respect to the portion of such taxable income which is allocable to Foreign Persons. The withholding will be required whether or not the Partnership makes distributions to a Foreign Person. The rate of withholding will be equal to the highest rate of Federal income tax applicable to each such Foreign Person. Each Foreign Person's proportionate share of such withheld tax will be treated as actually distributed to such Foreign Person during the Partnership's taxable year in which the tax was paid and will constitute a refundable credit against the Foreign Person's Federal income tax liability, which may be claimed on the Foreign Person's United States Federal income tax return.

Withholding is also required on United States source dividends, certain original issue discount and certain interest which is not effectively connected with a trade or business conducted within the United States at the rate of 30%, unless reduced by treaty. A Foreign Person is generally not subject to United States tax on interest income derived from registered obligations (for which the Foreign Person provides a statement of foreign status) or bank deposits or on the discount earned on non-interest bearing obligations with a maturity date of less than 184 days, provided, that such Foreign Person is not engaged in a trade or business

Page 28

within the United States during such taxable year. The withholding tax on this non-effectively connected income is nonrefundable and is imposed upon gross income, without reduction for expenses. Prospective investors which are not United States persons (as defined in the Code) are urged to consult their tax advisers regarding the potential effect of the United States tax laws (and the rules and regulations promulgated thereunder) upon such persons' investments in the Partnership.

### State and Local Tax Considerations

The Partnership and Partners will be subject to state and local income, estate, gift, inheritance and other taxes, the consequences of which may differ significantly from federal taxes. The impact of such laws, as well as the impact of federal, state, local and foreign estate or inheritance tax laws, should be discussed with each Partner's own tax counsel or other advisor. All Delaware limited partnerships must pay an annual state franchise tax of $200 per year. Taxes are due to be received no later than June 1 of each year.

THE FOREGOING ANALYSIS OF THE FEDERAL AND STATE TAX CONSIDERATIONS IS NOT INTENDED AS A SUBSTITUTE FOR INDIVIDUAL TAX PLANNING. ACCORDINGLY, PERSONS CONTEMPLATING AN INVESTMENT IN THE PARTNERSHIP SHOULD CONSULT THEIR TAX COUNSEL OR OTHER ADVISORS WITH SPECIFIC REFERENCE TO THEIR OWN TAX SITUATIONS.

MGMC, LP

## CONFLICTS OF INTEREST

The contractual and other arrangements among the Partnership, the General Partner and their affiliates are subject to various conflicts of interest in their relations with the Partnership. The contractual and other arrangements among the Partnership, the General Partner and their Affiliates have been established by the General Partner and are not the result of arms-length negotiations. Accordingly, prospective investors should carefully consider the following conflicts of interest before purchasing any Interests. The following conflicts of interest do not purport to be a complete or exhaustive explanation of the conflicts involved in this offering. Prospective investors should read the entire investment summary and the exhibits hereto and should ask such questions of and obtain such additional information from the General Partner as they shall deem necessary before deciding to invest in the Partnership.

In evaluating these conflicts of interests, potential investors should be aware that the General Partner has a responsibility to the Limited Partners to exercise good faith and fairness in all dealings affecting the Partnership. In the event that a Limited Partner believes that the General Partner has violated its duty to the Limited Partners, it may seek legal relief for itself or on behalf of the Partnership under applicable laws and regulations to recover damages from or require an accounting by the General Partner.

Limited Partners should be aware that the performance by the General Partner of its responsibilities to the Partnership will be measured by the terms of the Limited Partnership Agreement and applicable law. Limited Partners should be aware that it may be difficult to establish that the Partnership's trading has been excessive due to the broad trading discretion given to the General Partner under the Limited Partnership Agreement, the authority given to the General Partner to enter into the Limited Partnership Agreement under the Subscription Agreement/Power of Attorney, the exculpatory provisions in the Limited Partnership Agreement and the absence of judicial or administrative standards defining excessive trading.

### Non Arms-Length Agreements

All agreements and arrangements, including those relating to compensation, expense reimbursements and indemnification between the Partnership and General Partner and among their affiliates, are not the result of arms-length negotiations. The General Partner will determine whether the various Affiliates of the General Partner and the Partnership are, in accordance with the terms of the Partnership Agreement, entitled to exculpation and indemnification.

## Incentive Allocation and Fees

The structure of the Incentive Allocation may involve a conflict of interest, because it may create an incentive to cause the Partnership to make riskier or more speculative investments than it otherwise would. In some cases, the Incentive Allocation together with the fees charged by the General Partner may be greater than the total fees and other benefits provided by other investment advisers for similar services; in other cases the benefits may be lower.

Notwithstanding significantly different investment objectives, assuming particular securities are "suitable" for the Partnership and other limited partnerships with which the General Partner (or its Affiliates) are affiliated, conflicts of interest may arise as to which of the partnerships (including the Partnership) should proceed to acquire the investment securities. The General Partner will seek to resolve these conflicts in as equitable a manner as possible under the prevailing facts and circumstances, but there is no assurance that any such conflicts will be resolved in a manner advantageous to the Partnership.

## Competition with the Partnership

### Competition with the Partnership from Managed Accounts for Securities Transactions

The General Partner and its principals are free to manage accounts for investors, investment vehicles, itself, its employees, its principals, and their respective families, and is free to trade on the basis of methods similar or identical to those employed by the Partnership or methods which are entirely independent of such methods. Limited Partners will not be permitted to inspect the records of accounts or any written policies relating to such General Partner or its affiliates, except in the discretion of the General Partner.

It is possible that orders for the account of the General Partner or its principals may be entered in advance of the Partnership for legitimate and explainable reasons such as a neutral order allocation system, a different trading program, or a higher risk level of trading. However, any such proprietary trading is subject to the duty of the General Partner to exercise good faith and fairness in all matters affecting Limited Partners and client accounts, respectively.

## Conflicts as to Investment Opportunities

The General Partner is obligated to use its best efforts to provide the Partnership with continuing and suitable investment opportunities consistent with its investment objectives, policies and strategies; however, the General Partner is not required to present to the Partnership any investment opportunity which has come to its attention even if such opportunity is consistent with the investment objectives, policies and strategies of the Partnership. Accordingly, the Partnership may not be given the opportunity to participate in certain investments made by the General Partner and their Affiliates. In addition, if the Partnership rejects an investment opportunity for any reason, the General Partner and its affiliates may accept it. The General Partner will endeavor to resolve conflicts of interest with

MGMC, LP

respect to investment opportunities in a manner deemed equitable to all to the extent possible under the prevailing facts and circumstances and consistent with the General Partner's fiduciary duties.

## RISK FACTORS

Prospective investors should carefully consider the risks involved in an investment in the Partnership, including but not limited to those discussed below. Many of those risks are discussed more fully elsewhere in this Memorandum. Prospective investors should consult their own legal, tax, and financial advisers as to all these risks and an investment in the Partnership generally.

### *GENERAL*

The transactions in which the Partnership will generally engage involve significant trading risks. No assurance can be given that Limited Partners will realize a profit on their investment. Moreover, each Limited Partner may lose some or all of its investment. Because of the nature of the Partnership's investment activities, the results of the Partnership's operations may fluctuate from period to period. Accordingly, investors should understand that the results of a particular period will not necessarily be indicative of results in future periods.

#### Reliance on the General Partner

The success of the Partnership will depend on the ability of the principal officer, member and director of the General Partner, Mr. Jeffrey R. Freedman, to manage and implement investment strategies to achieve the Partnership's investment objectives according the Wealth Generators trading strategies.

#### Limited Partners Will Not Participate In Management

Purchasers of the Interests will become Limited Partners in the Partnership and, as such, will not be entitled to participate in the management of the Partnership. The Limited Partnership Agreement and the Partnership Act, however, provide Limited Partners with certain voting and other rights.

#### Operating Deficits

The expenses of operating the Partnership (including expenses payable to the General Partner) could exceed its income, requiring that the difference be paid out of the Partnership's capital, reducing the Partnership's investments and potential for profitability. See "SUMMARY OF FEES AND EXPENSES" and "INCENTIVE ALLOCATION."

### *INVESTMENT RISKS*

All securities investing and trading activities risk the loss of capital. While attempts will be made to moderate these risks, there can be no assurance that the Partnership's strategy will be successful and the Limited Partners could suffer substantial losses. The following discussion sets forth some of the more significant risks associated with the Partnership's proposed activities.

#### Investments May Be Speculative

Substantial risks are involved in investing in and trading equities and other securities and instruments. For this reason, a potential investor in the Partnership should note that the prices of the Partnership's investments may be highly volatile. Market movements are difficult to predict and are influenced by, among other factors, corporate and industry developments, interest rates, general economic conditions, governmental actions, domestic and international political news, governmental trade and fiscal policies, patterns of trade and other factors. In addition, because the Partnership may invest a significant portion of its assets from time to time in either a bullish or bearish position as an outright position speculating on the direction of a market, such speculation may increase the volatility of the Partnerships returns and increases its risk of loss.

#### Brokerage Commissions/Transaction Costs

The Partnership's portfolio turnover rate and its brokerage commission expenses and other transactional costs are expected to be substantial given the nature and frequency of its trading activity, however, these costs will be borne by the Partnership regardless of its profitability.

#### Illiquidity of Markets

From time to time, a market for a particular issue held by the Partnership may not exist. Among the reasons why a market might not exist in a particular issue are the following:

i.      trading halts, suspensions, or other restrictions may be imposed by an exchange or governmental authority;

ii.      unusual or unforeseen circumstances may interrupt normal exchange operations; or

iii.      one or more exchanges on which the issue trades could be compelled, for economic, regulatory, or other reasons, to discontinue the trading in an issue.

#### Margin and Leverage

The Partnership may trade Securities on a leveraged basis (i.e., where the security can be purchased by putting up only a portion of the instrument's face value and borrowing the remainder (margin)). The level of margin deposits required by exchange regulations and the Federal Reserve Board in connection with many of the Partnership's activities currently permit a high degree of leverage. As a result, a relatively small price movement in Securities may result in

MGMC, LP

immediate and substantial losses. In addition, trading on margin will result in interest charges to the Partnership that may be substantial.

### Risks Related to Securities Trading

**Short-Term Trading.** The Partnership's engaging in short term trading may result in the Partnership experiencing significant turnover and transaction costs.

**Short Sales.** The possible losses to the Partnership from a short sale of a security differ from losses that could be incurred from a cash investment in the security; the former may be unlimited, whereas the latter can only be equal to the total amount of the cash investment. Short-selling activities are subject to restrictions imposed by the Federal securities laws and the various securities exchanges.

**Options.** Purchasing and selling of call and put options entail risks. Although an option buyer's risk is limited to the amount of the purchase price of the option, an investment in an option may be subject to greater fluctuation than an investment in the underlying securities. An uncovered call writer's loss is potentially unlimited. The risk for a writer of a put option is that the price of the underlying security may fall below the exercise price.

The effectiveness of purchasing or selling stock index options as a hedging technique will depend upon the extent to which price movements in the portion of the Partnership's portfolio that is hedged correlate with price movements of the stock index selected. Because the value of an index option depends upon movements in the level of the index rather than the price of a particular stock, whether the Partnership will realize a gain or loss from the purchase or writing of options on an index depends upon movements in the level of stock prices in the stock market generally, rather than movements in the price of a particular stock. Successful use by the Partnership of Options on stock indexes will depend upon the ability of the General Partner to predict correctly the movements in the direction of the stock market generally. This ability requires skills and techniques different from those used in predicting changes in the prices of individual stocks.

**Price Fluctuations.** Substantial risks are involved in purchasing and trading securities. Trading is speculative, prices are volatile and market conditions are difficult to predict. Government activities, including those of the Federal Reserve Board, the Securities and Exchange Commission and the Commodity Futures Trading Commission, also have a profound effect on interest rates, which in turn affect securities prices. Politics, inflation, trade policies, war, general economic conditions, or other unforeseen events can also have significant effects on the value and trading prices of securities.

Changes in the securities markets and general economic conditions, including economic downturns, fluctuations in interest rates, the availability of credit, inflation and other factors, may affect the value of investments of the Partnership.

## Short Selling

Short sales can, in some circumstances, substantially increase the impact of adverse price movements on the Partnership's portfolio. A short sale creates the risk of a theoretically unlimited loss, in that the price of the underlying security could theoretically increase without limit, thus increasing the cost to the Partnership of buying securities to cover the short position.

In addition, when a security is shorted, shares are borrowed and subsequently sold on the open market. The lender of the securities may, at their sole discretion, call the shares and demand replacement of the borrowed securities. As a result the Partnership may be forced to replace the borrowed shares by buying an equivalent amount in the market, and, in order to maintain minimum overall risk, simultaneously selling the long position as well. Depending on the market prices of the two securities at the time of this unwinding, the Partnership could experience a net loss.

## Credit or Conversion Risk

The Partnership will be subject to the risk of the inability of counterparties to perform with respect to transactions, whether due to insolvency, bankruptcy or other causes, which could subject the Partnership to substantial losses. In an effort to mitigate such risks, the Partnership will attempt to limit its transactions to counterparties which are established, well capitalized and creditworthy.

## Concentration of Investments

The Partnership Agreement does not limit the amount of the Partnership's capital that may be committed to any single investment, industry or sector. While the General Partner intends to spread the Partnership's capital among a number of investments, the Partnership Agreement imposes no limits on the concentration of the Partnership's investments in particular securities, industries, or sectors and at times the Partnership may hold a relatively small number of securities positions, each representing a relatively large portion of the Partnership's capital. In addition, the Partnership may begin operations without attaining any particular level of capitalization. Losses incurred in such positions could have a materially adverse effect on the Partnership's overall financial condition. At low asset levels, the Partnership may be unable to take advantage of potential economies of scale, including the ability to obtain the most timely and valuable research and trading information from securities brokers. It is possible that even if the Partnership operates for a period with substantial capital, Limited Partners' withdrawals could diminish the Partnership's assets to a level that does not permit the most efficient and effective implementation of the Partnership's investment program.

## General Economic and Market Conditions

General economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws, and national and international political circumstances may affect the success of the Partnership's activities. These factors may affect

MGMC, LP

the level and volatility of securities prices and the liquidity of the Partnership's investments. Unexpected volatility or illiquidity could impair the Partnership's profitability or result in losses.

### Changes in Investment Strategies

The Limited Partnership Agreement gives the General Partner broad discretion to expand, revise or contract the Partnership's business without the consent of the Limited Partners. Thus, the investment strategies of the General Partner may be altered without prior approval by, or notice to, the Limited Partners if the General Partner determines that such change is in the best interests of the Partnership. Any such decision to engage in a new activity could result in the exposure of the Partnership's capital to additional risks that may be substantial. See "SUMMARY OF LIMITED PARTNERSHIP AGREEMENT."

### Limited Liquidity of Some Investments

Some of the securities in which the Partnership invests may be relatively illiquid, either because they are thinly traded, or because they are subject to transfer restrictions. The Partnership may not be able promptly to liquidate those investments if the need should arise, and its ability to realize gains or to avoid losses in periods of rapid market activity may therefore be affected. In addition, the value assigned to such securities for purposes of determining Limited Partners' partnership percentages and determining Net Profits and Net Losses may differ from the value the Partnership is ultimately able to realize.

### Insolvency of Brokers and Others

The Partnership will be subject to the risk of failure of the brokerage firms that execute its trades, the clearing firms that such brokers use, or the clearinghouses of which such clearing firms are members. In the event of a failure of a broker/dealer used by the Partnership, the United States Securities Investor Protection Company ("SIPC") provides a maximum of $500,000 of account insurance, only $100,000 of which may be taken in cash.

## PARTNERSHIP RISKS

### Tax Liability without Distributions

Partners will be liable to pay taxes on their allocable shares of Partnership taxable income. However, the General Partner does not intend to make significant distributions to the Limited Partners corresponding to profits, but instead intends to re-invest substantially all of the Partnership's income and gains for the foreseeable future. Taxable income can be expected to differ from gains in a Partner's Book Capital Account, primarily because generally only realized gains and losses are considered for income tax purposes but profits and losses in a Partner's Book Capital Account will include unrealized gains and losses. It is possible that sales of appreciated securities in a particular period could cause some Partners to have taxable gain for that period at the same time that unrealized losses result in an overall Net Loss. It will generally be necessary for Partners to pay such tax liabilities out of separate Partnerships or withdrawals

from the Partnership. There are limitations on a Partner's right to withdraw Partnerships from the Partnership. See "OFFERING OF INTERESTS" and "TAX CONSIDERATIONS."

### No Public Market for Interests

There is no public market for Interests and the Partnership Agreement imposes significant limitations on Limited Partners' abilities to transfer Interests. In addition, rights to withdraw from the Partnership are subject to several limitations. A Limited Partner may withdraw from the Partnership only upon the close of business on the last Business Day of each calendar month, and then only after giving 30 days' notice and subject to certain dollar limitations unless the General Partner consents (which it may decline to do, in its sole and absolute discretion) to a deviation from one or more of such procedures or limitations. The General Partner has the discretion to deliver amounts withdrawn in securities rather than cash. Further, as to all or a portion of a withdrawn amount, the General Partner may establish a segregated portfolio of some of the Partnership's securities and liquidate those securities for the withdrawing Limited Partner's account. In either such case, the securities so delivered or segregated may be relatively illiquid and the Limited Partner would bear the risk of a decline in their value after the effective time of his or her withdrawal. These facts, taken together, will significantly affect the liquidity of a Limited Partner's investment in the Partnership, See "OFFERING OF INTERESTS" and "SUMMARY OF THE LIMITED PARTNERSHIP AGREEMENT."

### Effect of Substantial Withdrawals

Substantial withdrawals by Limited Partners within a short period of time could require the Partnership to liquidate securities positions more rapidly than would otherwise be desirable, possibly reducing the value of the Partnership's assets and/or disrupting the General Partner's investment strategy. Reduction in the size of the Partnership could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Partnership's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

### Potential Mandatory Withdrawal

The General Partner may, in its sole discretion at any month-end on 10 days notice, require a Limited Partner to withdraw all or a portion of his or her capital account balance. Such mandatory withdrawal could result in adverse tax and/or economic consequences to such Limited Partner. See "SUMMARY OF THE LIMITED PARTNERSHIP AGREEMENT."

## OTHER RISKS

### Tax Considerations

For a more detailed discussion of the income tax considerations associated with an investment in the Partnership, see the discussion below under "TAX CONSIDERATIONS."

MGMC, LP

### Limitations on Deductions

Tax laws in certain cases may limit a Partner's ability to deduct certain losses and expenditures allocable to such Partner.

### Allocations

The Partnership intends to allocate all items of taxable income, gain, loss, deduction and credit among the Partners in a manner that is generally consistent with the economic sharing arrangements. It is currently expected that the Partnership will use a method of allocation that complies with one of the "safe harbors" provided in applicable Treasury Regulations. However, the General Partner retains discretion to allocate items in a manner that deviates from such safe harbor, and there can be no assurance that the Internal Revenue Service will respect such allocations. See "TAX CONSIDERATIONS."

### Possibility of Taxation as a Corporation

It is the General Partner's belief that under current Federal income tax law, the Partnership will be taxed as a partnership and not as a corporation. This status has not been confirmed by a ruling from, and such opinion is not binding upon, the IRS. No such ruling has been or will be requested. The facts and authorities relied upon by counsel in their opinion may change in the future, including with respect to regulations which may be promulgated under recent amendments to Federal tax statutes. If the Partnership were treated as a corporation for Federal income tax purposes, the income and deductions of the Partnership would be reflected only on its own tax return rather than being passed through to the partners, and income would be taxed to the Partnership at corporate rates. No losses of the Partnership would be allowable as deductions of the partners. In addition, all or a portion of any distributions made by the Partnership to the partners, other than liquidating distributions, would constitute dividends to the extent of the Partnership's current or accumulated earnings and profits, and the amount of such distributions would not be deductible by the Partnership in computing its taxable income. See "TAX CONSIDERATIONS."

### Possibility of Tax Audits

Under the terms of the allocation provisions in the Limited Partnership Agreement, partners experiencing depreciation in their Book Capital Accounts during the fiscal year may be allocated capital loss for Federal income tax purposes even though the Partnership realized a net capital gain for the year. Conversely, partners experiencing appreciation in their Book Capital Accounts during the fiscal year may be allocated capital gain for Federal income tax purposes even though the Partnership realized a net capital loss for the year. As a result, the Partnership's method of allocating gain and loss to the partners may enhance the possibility that the Partnership's tax return and individual partners' returns might be audited by the IRS.

If the Partnership's tax return were to be audited by the IRS, there can be no assurance that adjustments would not be made to the return as a result of such an audit The Partnership audit

Case 1:21-cv-00495 ECF No. 1-3, PageID.83 Filed 06/11/21 Page 41 of 57
Case 3:22-mc-00020-L-BH Document 2-3 Filed 03/18/22 Page 84 of 100 PageID 108

MGMC, LP

procedures have been simplified and adjustments may be made at the Partnership level that will bind all the partners. A general partner of a partnership is to be designated as the "tax matters partner," who is to be the Partnership's primary representative with respect to the IRS and will possess the power to extend the statute of limitations for assessment and collection with respect to such audits for all partners. By executing the Limited Partnership Agreement, the Limited Partners appoint the General Partner to act as the "tax matters partner" of the Partnership. If an audit of the Partnership returns results in an adjustment, the Limited Partners' returns may be audited. Any expenses incurred in an audit of their individual returns must be borne by the Limited Partners. Furthermore, interest charged by the IRS on tax deficiencies is substantial and is compounded daily.

### Other Possible Tax Law Changes

No assurance can be given that legislative, administrative or judicial changes will not occur which will alter either prospectively or retroactively, the tax considerations or risk factors discussed in this Memorandum. Existing and prospective Limited Partners should seek, and must rely on, the advice of their own tax advisers with respect to the possible impact on their investment of any future proposed tax legislation or administrative or judicial action.

## *Regulatory Matters*

### Investment Company Regulation

The Partnership intends to rely on the provisions of Section 3(c)(1) of the Investment Company Act of 1940, as amended (the "ICA") to avoid requirements that it register as an "investment company" under and comply with the substantive provisions of the ICA. Section 3(c)(1) of the ICA provides an exemption for entities whose outstanding securities are beneficially owned by not more than 100 persons and which does not propose to make a public offering of its securities. If the Partnership were registered as an investment company, the ICA would require, among other things, that the Partnership have a board of directors some of whom were unrelated to the General Partner, compel certain custodial arrangements, and regulate the relationship and transactions between the Partnership and the General Partner. Compliance with some of those provisions could possibly reduce certain risks of loss by the Partnership or Limited Partners, although such compliance could significantly increase the Partnership's operating expenses and limit the Partnership's investment and trading activities. Interpretations of Section 3(c)(1) are complex and uncertain in several respects and, as a result, there can be no assurance that the Partnership will remain entitled to rely on that Section. If the Partnership were found not to have been entitled to such reliance, it and the General Partner could be subject to legal actions by the SEC and others and the Partnership could be forced to terminate its business under adverse circumstances.

MGMC, LP

### Private Offering Exemption

The Partnership intends to offer Interests on a continuing basis without registration under any securities laws in reliance on an exemption for "transactions by an issuer not involving any public offering." While the General Partner believes reliance on such exemptions is justified, there can be no assurance that factors such as the manner in which offers and sales are made, concurrent offerings by other partnerships, the scope of disclosure provided, failures to make notices, filings, or changes in applicable laws, regulations, or interpretations will not cause the Partnership to fail to qualify for such exemptions under Federal or one or more states' laws. Failure to so qualify could result in the rescission of sales of Interests at prices higher than the current value of those Interests, potentially affecting materially the Partnership's performance and business, Further, even non-meritorious claims that offers and sales of Interests were not made in compliance with applicable securities laws could materially and adversely affect the General Partner's ability to conduct the Partnership's business.

### Other

The Partnership and the General Partner will be subject to various other regulations, securities laws and others rules, laws or regulations that could limit some aspects of the Partnership's operations or subject the Partnership or the General Partner to the risk of sanctions for noncompliance.

### Litigation

The Partnership might be named as a defendant in a lawsuit or regulatory action stemming from the activities of the General Partner. In the event that such litigation did occur, the Partnership would bear the additional costs of defending against it, be at further risk if the case were to be lost and may be forced to suspend withdrawals of Interests due to the resulting illiquidity of the Partnership's investments.

### Possible Indemnification Obligations

The Partnership is generally obligated to indemnify the General Partner under the Limited Partnership Agreement against any liability they or their respective affiliates may incur in connection with their relationship with the Partnership.

*THIS FOREGOING LIST OF CONFLICTS OF INTEREST AND RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE EXPLANATION OF THE RISKS INVOLVED IN THIS OFFERING. POTENTIAL INVESTORS SHOULD READ THE ENTIRE MEMORANDUM BEFORE DETERMINING TO INVEST IN THE PARTNERSHIP.*

# EMPLOYEE BENEFIT PLANS SUBJECT TO ERISA

### General

Each respective Limited Partner which is an employee benefit plan or trust (an "ERISA Plan") within the meaning of, and subject to, the provisions of ERISA, or an individual retirement account ("IRA") or Keogh Plan subject to the Internet Revenue Act of 1986, as amended ("the Code") and should consider the matters described below in determining whether to invest in the Partnership.

In addition, ERISA plan fiduciaries must give appropriate consideration to, among other things, the role that an investment in the Partnership plays in such ERISA Plan's portfolio, taking into consideration whether the investment is designed reasonably to further the ERISA Plan's purposes, an examination of the risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the ERISA Plan's objectives and the limited right of Partners to withdraw all or any part of their capital accounts or to transfer their interests in the Partnership.

If the assets of the Partnership were regarded as "plan assets" of an ERISA Plan, an IRA, or a Keogh Plan (collectively, "Plans" or "Qualified Plans"), the General Partner would be a "fiduciary" (as defined in ERISA) with respect to such Plans and would be subject to the obligations and liabilities imposed on fiduciaries by ERISA. Moreover, various other requirements of ERISA also would be imposed on the Partnership. In particular, rules restricting transactions with "parties in interest" and prohibiting transactions involving conflicts of interest on the part of fiduciaries would be imposed on the Partnership which might result in violation of ERISA unless the Partnership obtained an appropriate exemption from the Department of Labor (the "DOL") allowing the Partnership to conduct its operations as described herein.

A regulation adopted by the Department of Labor ("DOL") (the "Regulation") provides that when a Plan invests in another entity, the Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that, among other exceptions, the equity participation in the entity by "benefit plan investors" ("Benefit Plan Investors") is not "significant."

Under the Plan Regulations, participation by Benefit Plan Investors is "significant" on any date if, immediately after the last acquisition, (25%) percent or more of the value of any class of equity interests in the entity (disregarding the holding of the General Partner or its affiliates other than Benefit Plan Investors) is held by Benefit Plan Investors. The General Partner intends to limit the participation in the Partnership by Benefit Plan investors to the extent necessary so that participation by Benefit Plan investors will not be "significant" within the meaning of the Plan Regulations. Therefore, it is not expected that the Partnership's assets will constitute "plan assets" of plans that acquire interests.

The Plan Assets Rule applies to Benefit Plans subject to Title I of ERISA. IRAs are not included in the definition of Benefit Plans in the Regulation. Although IRAs are included in the (25%)

**MGMC, LP**

percent calculation to determine if participation by Benefit Plans is "significant," the General Partner may choose to restrict Benefit Plans from investing in the Partnership in an effort to maximize the participation of IRAs.

Furthermore, for purposes of determining whether Benefit Plan Investors hold twenty-five (25%) percent or more of the value of any class of equity interest, those equity interests held by the General Partner or any other person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of the Partnership or any person who provides investment advice for a fee (direct or indirect) with respect to such assets or any affiliate of such person, will be disregarded.

It is the current intent of the General Partner to limit the aggregate investment by Benefit Plan Investors to less than twenty-five (25%) percent of the value of the Limited Partners' Interests so that equity participation of Benefit Plan Investors will not be considered "significant." The General Partner reserves the right, however, to waive the twenty-five (25%) percent limitation and thereafter to cause the Partnership to comply with the applicable provisions of ERISA and the code. In such case, the General Partner would provide notice to the existing Limited Partners.

WHETHER OR NOT THE UNDERLYING ASSETS OF THE PARTNERSHIP ARE DEEMED PLAN ASSETS UNDER THE REGULATION, AN INVESTMENT IN THE PARTNERSHIP BY A PLAN IS SUBJECT TO ERISA AND TO THE CODE. ACCORDINGLY, FIDUCIARIES OF PLANS SHOULD CONSULT WITH THEIR OWN COUNSEL AS TO THE CONSEQUENCES UNDER ERISA OR THE CODE OF AN INVESTMENT IN THE PARTNERSHIP.

### Unrelated Business Taxable Income

Qualified Plans are generally exempt from federal income taxation under the Code. However, Qualified Plans are subject to federal income taxation to the extent that they have any "unrelated business taxable income" ("UBTI") (as determined in accordance with Sections 511 514 of the Code) in any taxable year. See "Tax Considerations – Tax Exempt Organizations."

FIDUCIARIES SHOULD CONSULT THEIR OWN TAX ADVISERS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES OF INVESTING ASSETS OF A QUALIFIED PLAN IN THE PARTNERSHIP. ACCEPTANCE OF SUBSCRIPTIONS ON BEHALF OF INDIVIDUAL RETIREMENT ACCOUNTS OR OTHER EMPLOYEE BENEFIT PLANS IS IN NO RESPECT A REPRESENTATION BY THE PARTNERSHIP, THE GENERAL PARTNER OR ANY OTHER PARTY THAT THIS INVESTMENT MEETS ALL RELEVANT LEGAL REQUIREMENTS WITH RESPECT TO INVESTMENTS BY ANY PARTICULAR PLAN. THE PERSON WITH INVESTMENT DISCRETION SHOULD CONSULT WITH HIS OR HER ATTORNEY AND FINANCIAL ADVISERS AS TO THE PROPRIETY OF SUCH AN INVESTMENT IN LIGHT OF THE CIRCUMSTANCES OF THAT PARTICULAR PLAN AND CURRENT TAX LAW.

Case 1:21-cv-00495 ECF No. 1-3, PageID.87 Filed 06/11/21 Page 45 of 57
Case 3:22-mc-00020-L-BH Document 2-3 Filed 03/18/22 Page 88 of 100 PageID 112

MGMC, LP

# BROKERAGE AND TRANSACTIONAL PRACTICES

In the course of its investment activities the Partnership will incur transaction expenses, including brokerage commissions. The General Partner will have complete discretion in deciding what brokers and dealers the Partnership will use and in negotiating rates of brokerage compensation. In addition to using brokers as agents and paying commissions, the Partnership may buy or sell securities directly from or to dealers acting as principal at prices that include markups or markdowns.

### Selection Criteria, Generally

In choosing brokers and dealers, the General Partner will not be required to consider any particular criteria. For the most part, the General Partner will seek the best combination of brokerage expenses and execution quality but, as discussed below, the General Partner is not required to select the broker or dealer that charges the lowest transaction cost, even if that broker provides execution quality comparable to other brokers or dealers. In evaluating "execution quality" historical net prices (after markups, markdowns or other transaction related compensation) on other transactions will be a principal factor, but other factors will also be relevant, including: the execution, clearance, and settlement and error correction capabilities of the broker or dealer generally and in connection with securities of the type and in the amounts to be bought or sold; the broker's or dealer's willingness to commit capital; reliability and financial stability; the size of the transaction; availability of securities to borrow for short sales; and the market for the security.

### Brokerage, Custody, and Clearing and Settling

The Partnership intends to enter into a "brokerage" arrangement with a registered broker/dealer (the "Broker"). Under this arrangement, the Broker will provide certain recordkeeping services and perform the following functions, among others: (i) arrange for the receipt and delivery of securities bought, sold, borrowed, and loaned, (ii) make and receive payments for securities; (iii) maintain custody of cash and securities; (iv) deliver cash to the Partnership's bank accounts; and (v) tender securities in connection with tender offers, exchange offers, mergers, or other corporate reorganizations.

The Partnership may pay for custodial and related services either in cash or by allocating a portion of its brokerage business to the Broker. The Partnership is not committed to continue its "brokerage" relationship with the Broker for any minimum period. If the Partnership uses another broker/dealer, it may be required to pay separate fees in cash.

### Soft Dollars

Although the General Partner is authorized to obtain brokerage and research services for the Partnership in consideration of commissions paid by the Partnership to broker-dealers for execution of portfolio transactions for the Partnership as authorized by Section 28(e) of the

MGMC, LP

Securities Exchange Act of 1934, as amended, the General Partner may also utilize soft-dollars for additional strategy and research services.

## SUMMARY OF THE LIMITED PARTNERSHIP AGREEMENT

The rights and duties of the General Partner and the Limited Partners are governed by provisions of the Partnership Act and by the Limited Partnership Agreement. Certain features of the Limited Partnership Agreement are outlined below, but reference is made to the Limited Partnership Agreement for complete details of its terms and conditions. As a result, the description of the Limited Partnership Agreement set forth below is qualified in its entirety by reference to the Amended and Restated Limited Partnership Agreement which is annexed as Exhibit A to this Memorandum.

### *Management Responsibilities of the General Partner*

Under the terms of the Limited Partnership Agreement, the General Partner shall have full, exclusive and complete control of all affairs of the Partnership, and the management and control of the Partnership's business shall rest exclusively with the General Partner, subject to the terms and conditions of the Limited Partnership Agreement. The General Partner shall be required to devote to the conduct of the business of the Partnership such time and attention as it determines to be necessary to accomplish the purposes and to conduct the business of the Partnership.

Subject to any and all limitations expressly set forth in the Limited Partnership Agreement, the General Partner shall perform or cause to be performed, at the Partnership's expense, the coordination of all management, administrative and operational functions relating to the business of the Partnership. Without limiting the generality of the foregoing, the General Partner is expressly authorized on behalf of the Partnership: (i) to engage independent agents, attorneys, accountants, and custodians as the General Partner deems necessary or advisable for the affairs of the Partnership on such terms as the General Partner deems desirable with compensation therefore to be borne by the Partnership, (ii) to enter, or cause the Partnership to enter, into an agreement or agreements with one or more entities (including affiliates of the General Partner) for management services, administrative services, clearing services brokerage services and such other services that the General Partner deems necessary in connection with the operation of the Partnership's business on such terms as the General Partner deems desirable with compensation therefore to be borne by the Partnership, (iii) to retain (or terminate) an Investment Manager or managers (including affiliates of the General Partner) as the Partnership's Investment Manager to supervise and/or assist with the investment and re-investment of Securities and other assets of the Partnership (the "Investment Manager") and to perform other related services and to pay such Investment Manager fees as agreed upon between the Investment Manager, the General Partner and the Partnership with compensation therefore to be borne by the Partnership, which may be in the form of salary or profit participation, (iv) to receive, buy, sell, exchange, trade, hold and otherwise deal in and with

Case 1:21-cv-00495 ECF No. 1-3, PageID.89 Filed 06/11/21 Page 47 of 57
Case 3:22-mc-00020-L-BH Document 2-3 Filed 03/18/22 Page 90 of 100 PageID 114

MGMC, LP

Securities and other property of the Partnership, (v) to borrow money on a secured or unsecured basis from banks, brokers, dealers or other financial institutions, (vi) to sign checks, (vii) to pay or authorize the payment of distributions to the Partners and of liabilities of the Partnership; including, without limitation, brokerage commissions and other transaction expenses, custodial fees, legal and accounting fees, registration and other fees of governmental agencies and other fees and expenses, (viii) to open, conduct and close accounts with brokers on behalf of the Partnership, (ix) to open, maintain and close accounts, including margin accounts, with brokers and banks, and to draw checks and other orders for the payment of money by the Partnership, (x) to file, on behalf of the Partnership, all required local, state and Federal tax and other returns relating to the Partnership, (xi) to cause the Partnership to purchase or bear the cost of any insurance covering the potential liabilities of the General Partner (and any associate, employee or agent of the General Partner) based upon or arising out of the General Partner's actions as General Partner under the Limited Partnership Agreement, (xii) to cause the Partnership to purchase or bear the cost of any insurance covering the potential liabilities of any person serving as a director, officer or employee of an entity in which the Partnership has an investment or of which the Partnership is a creditor, (xiii) to commence or defend litigation or submit to arbitration any claim or cause of action that pertains to the Partnership or any Partnership assets, (xiv) to enter into, make and perform contracts, agreements and other undertakings, and to do any other acts, as the General Partner deems necessary or advisable for, or as may be incidental to, the conduct of the business of the Partnership, including, without limiting the generality of the foregoing, contracts, agreements, undertakings and transactions with any Partner or with any other person, firm or corporation having any business, financial or other relationship with any Partner or Partners, (xv) to act for the Partnership in all other matters, and (xvi) to make or revoke elections pursuant to Section 754 of the Code, to adjust the basis of the Partnership's property as permitted by Sections 734(b) and 743(b) of the Code and to make, and revoke any other election affecting the computation of partnership income required to be made by the Partnership pursuant to Section 703(b) of the Code and any similar elections provided by state or local law or any similar provision enacted in lieu thereof; and to act as Tax Matters Partner for all purposes under the Code.

## Exercise of Rights by Limited Partners

A meeting of the Limited Partners for the purpose of acting upon any matter upon which the Limited Partners are entitled to vote may be called by the General Partner at any time. The General Partner shall give written notice of any such meeting to all Limited Partners and such meeting shall be held not less than 10 and not more than 60 days after the General Partner sends notice to the Limited Partners. The General Partner may submit any matter upon which the Limited Partners are entitled to vote to the Limited Partners for a vote by written consent without a meeting. Such written consents shall be treated for all purposes as votes at a meeting.

MGMC, LP

## Sharing of Profits and Losses

Under the terms of the Limited Partnership Agreement, the General Partner has sole discretion as to the distribution of profits, if any, to the Limited Partners. The General Partner does not intend to make a distribution if, in its opinion, the reduction in the amount of assets under management after giving effect to the distribution would not be in the best interests of the Partnership or the Limited Partners. Any distributions made by the Partnership to the Partners shall be made in cash or in securities, at the sole discretion of the General Partner, on a pro rata basis based upon the relative balance in each Partner's Book Capital Account as of the last day of the period to which the distribution relates. See "RISK FACTORS" and "CONFLICTS OF INTERESTS."

Each Limited Partner in the Partnership and the General Partner (individually, a "Partner" and collectively, the "Partners") will have a book capital account ("Book Capital Account") and a tax capital account ("Tax Capital Account"), the initial balance of each of which will be the amount contributed to the Partnership by such Partner. Any increase or decrease in the Net Asset Value of the Partnership will be allocated among the Partners on a monthly basis and will be added to or subtracted from the Book Capital Accounts of the Partners in the ratio that each Partner's Book Capital Account bears to all Partners' Book Capital Accounts, subject to the special allocation provisions set forth in the Limited Partnership Agreement. See "SUMMARY OF LIMITED PARTNERSHIP AGREEMENT – SPECIAL ALLOCATIONS".

In general, for Federal income tax purposes, all items of ordinary income and deduction are allocated among the Partners in proportion to their relative Book Capital Account balances during the period when such income is earned or such expense is incurred. Gains attributable to Section 1256 contracts ("Section 1256 contracts") under the Internal Revenue Code of 1986, as amended (the "Code") shall generally be allocated among the Partners experiencing appreciation in their Book Capital Accounts during the year in proportion to the relative appreciation experienced. Capital loss attributable to Section 1256 contracts shall generally be allocated among the Partners experiencing depreciation in their Book Capital Accounts during the year in the same manner. See "TAX CONSIDERATIONS."

## Allocation of Tax Profit and Loss

**Allocation of Tax Profit and Loss.** In general, all items of income, gain, loss and deduction (including items of income or gain which are not subject to Federal income taxation and expenditures described in Section 705(a)(2)(B) of the Code) shall be allocated among the Partners for each fiscal year of the Partnership as follows:

(a)    Ordinary Income shall be allocated among all Partners in proportion to the balance in each Partner's Book Capital Account as of the beginning of the accounting period in which such Ordinary Income was earned, except that for any accounting period in which an Incentive Allocation was made, there shall be an appropriate adjustment so that thirty-three and one-

Page 46

Case 1:21-cv-00495 ECF No. 1-3, PageID.91 Filed 06/11/21 Page 49 of 57
Case 3:22-mc-00020-L-BH Document 2-3 Filed 03/18/22 Page 92 of 100 PageID 116

MGMC, LP

third percent of the Ordinary Income associated with the related New Profits shall be allocated to the General Partner; and

(b)     Ordinary Losses shall be allocated among all Partners in proportion to the balance in each Partner's Book Capital Account as of the beginning of the accounting period in which such Ordinary Losses were incurred, until the value of any Partner's Tax Capital Account becomes zero. Thereafter, any remaining Ordinary Losses for the fiscal year shall be debited to the Capital Accounts of Partners having positive balances in proportion to those balances, until the value of each Partner's Capital Account becomes zero. Thereafter, any remaining Ordinary Losses for the fiscal year shall be debited to the General Partner's Capital Account

(c)     After all adjustments to Book Capital Accounts under the Limited Partnership Agreement have been made for the fiscal year of the Partnership and after all the allocations described in paragraphs (a) and (b) above, for the fiscal year of the Partnership have been made, the extent to which a Partner's Book Capital Account exceeds its Tax Capital Account ("Positive Disparity") or the extent to which a Partner's Tax Capital Account exceeds its Book Capital Account ("Negative Disparity") shall be determined. Capital Gain and Capital Loss shall then be allocated as follows:

1.     Capital Gain shall be allocated to each Partner who redeemed all of its Interest during such fiscal year to the extent of the Positive Disparity of such Partner in the ratio that such Positive Disparity bears to the total Positive Disparity of all Partners who redeemed all of their Interests during such fiscal year. Capital Gain remaining after such allocation shall be allocated first, to the remaining Partners to the extent of each such Partner's Positive Disparity in the ratio that such Positive Disparity bears to the total remaining Positive Disparity of all such Partners, and then to all Partners, pro rata based upon their respective Opening Book Capital Accounts for the accounting period in question, except that with respect to any accounting period in which an Incentive Allocation was made, there shall be an appropriate adjustment so that thirty-three and one-third percent of the Capital Gain associated with the related New Profits shall be allocated to the General Partner.

2.     Capital Loss shall be allocated to each Partner who redeemed all of its Interest during such fiscal year to the extent of the Negative Disparity of such Partner in the ratio that such Negative Disparity bears to the total Negative Disparity of all Partners who redeemed all of their Interests during such fiscal year. Capital Loss remaining after such allocation shall be allocated first to all other Partners to the extent of such Partner's Negative Disparity in the ratio that such Negative Disparity bears to the total remaining Negative Disparity of all such Partners and then to all Partners, pro rata based upon their respective Opening Book Capital Accounts for the accounting period in question.

(d)     Notwithstanding the provisions of the Limited Partnership Agreement described above, if any allocation would produce a deficit in the Book Capital Account or Tax Capital Account of any Limited Partner, the portion of such allocation which would create such deficit shall instead

MGMC, LP

be allocated to the Book Capital Account or Tax Capital Account, as applicable, of the General Partner.

(e)     In the event that the General Partner's Capital Account has a negative balance as a result of the allocation of Ordinary or Capital Losses, all subsequent Ordinary Income and Capital Gain of the Partnership shall be credited to the General Partner's Tax Capital Account, until such negative balance has been eliminated.

(f)     The General Partner may make such other or additional allocations of income, gain, loss and deduction among Partners as are, in its reasonable discretion, necessary to equitably reflect the amounts allocated to such Partners' Book Capital Accounts.

## Definition of Terms

The following terms shall have the following meanings:

(a)     Capital Gain or Capital Loss shall mean the gain or loss recognized by the Partnership for Federal income tax purposes attributable to a capital asset, including the gain or loss attributable to a "Section 1256 contract", as defined by Section 1256 of the Code, and any other asset the recognition of gain or loss of which, for Federal income tax purposes, is not dependent upon the sale or other disposition thereof.

(b)     Ordinary Income shall mean all items of Partnership income or gain other than Capital Gain.

(c)     Ordinary Loss shall mean all items of Partnership loss or expense other than Capital Loss.

The allocation provisions described above are subject to the special allocation provisions described below.

## Withdrawals

All or a portion of a Limited Partners' Interest may be redeemed upon the close of business on the last Business Day of each calendar quarter, all or a portion of such Interest may be withdrawn on 30 days' prior written notice to the General Partner, subject to certain restrictions ("Withdrawal Date"). Withdrawals may be subject to certain restrictions and to the establishment of reserves in respect of undetermined and contingent liabilities. Written notice of withdrawal must be received by the General Partner at least 30 days prior to a Withdrawal Date, unless such notice is waived by the General Partner in its sole discretion. Distribution of a partial withdrawal will normally be made as soon as practicable following the Withdrawal Date. In the event of a total withdrawal, the General Partner shall distribute 90% of its good faith estimate of a withdrawing Limited Partner's Book Capital Account as soon as practicable after the Withdrawal Date and shall distribute the remaining portion of the withdrawing Limited Partner's Book Capital Account as promptly as practicable after completion of final

reconciliation of the value of the withdrawing Limited Partner's Book Capital Account, generally not to exceed 120 days after the Withdrawal Date.

The General Partner may, in its sole discretion: (a) postpone the distribution of any Partnership assets which cannot be properly valued (such as real estate and restricted securities) on the Withdrawal Date until such time when the assets are sold or can otherwise be properly valued; (b) reduce the amount to be paid to a Limited Partner in connection with the General Partner's establishment of a reserve against any undetermined or contingent liability in an amount deemed reasonable by the General Partner; and (c) amend, modify, liberalize or restrict the terms and conditions of the Limited Partners' withdrawal privileges to the extent deemed necessary or advisable in connection with any further offerings (public or private) of Partnership Interests for sale.

A Limited Partner will be deemed to have withdrawn from the Partnership upon its giving notice of withdrawal of its entire Interest in the Partnership. The complete withdrawal of a Limited Partner shall also occur in the event of the death, expulsion, legal incapacity or bankruptcy of the Limited Partner, or if for any other reason such person ceases to be a Limited Partner (other than the termination of the Partnership); in the event of any such complete withdrawal, the Limited Partner, or his estate will be entitled to receive the distributions. The withdrawal of a Limited Partner will not terminate the Partnership. Such withdrawal will terminate the interest of the withdrawn Partner in the Partnership except that such Partner shall have access to the books and records of the Partnership and to such data as may be necessary to give full information with respect to its distributive interest.

Withdrawal of a Limited Partner shall not occur for purposes of computing the withdrawing Limited Partner's distributive interest pursuant to the Limited Partnership Agreement until the last day of the calendar month in which both (a) such event has taken place and (b) the General Partner has been appropriately informed in writing of such event.

The General Partner, in its sole and absolute discretion, may cause the Partnership to purchase and redeem all or a portion of the Partnership Interests of any Limited Partner effective any month-end upon ten (10) days prior written notice. The purchase and redemption price payable to the Limited Partner after the giving of such notice shall be the value of the Limited Partner's Book Capital Account on the effective date. A Limited Partner who withdraws all of his or her Capital Account will be deemed to have withdrawn from the Partnership as a Limited Partner.

Upon the withdrawal of a Limited Partner or upon the termination of the Partnership, all in accordance with the terms of the Limited Partnership Agreement, each withdrawing Limited Partner, or each Partner, as the case may be, shall be paid its respective distributive interest in cash or, in the discretion of the General Partner, in Securities selected by the General Partner, or partly in Securities selected by the General Partner and partly in cash.

Upon the complete withdrawal of a Limited Partner, all of its rights in specific Partnership property of every kind whatsoever, including, but not limited to, all books of account, records, and papers of the Partnership, shall immediately and without further assignment, pass to and

MGMC, LP

become vested in the remaining or surviving Partners. The withdrawing Limited Partner and its legal representatives shall have only the right to receive the distributions to withdrawn Limited Partners provided for under the Limited Partnership Agreement; provided, however, that a withdrawn Limited Partner and its legal representatives shall continue to have access to the books and records of the Partnership and such other data to the extent necessary to obtain full information with respect to its distributive interest.

### Distributions

New Profits realized from gains or portfolio investments will be calculated and available for distribution after the payment of Partnership expenses and the establishment of operating reserves. There is no requirement that the Partnership make any such distributions. Any such distributions will be made in the discretion of the General Partner; however, Limited Partners will be entitled to withdraw all or part of their Interests as described under the caption "Withdrawals" above.

### Accounts, Records, Reports and Pricing

At the end of each calendar quarter, the General Partner will prepare and send to each partner, or make available through an electronic means, an unaudited quarterly statement. The quarterly statement will report performance of the Partnership, the value of a Partner's Capital Account and other information. At the end of each calendar month, the General Partner will prepare the balance of each capital account for each limited partner. The information will be available upon request and the closing balance required for proper distributions and reporting.

For purposes of preparing such statements and capital account values, the General Partner will price the Partnership's portfolio of Securities based upon the last reported sales prices for such securities or if no sales are reported, the mean between the bid and ask on the applicable primary market in the case of securities or contracts listed on an established securities exchange.

The books of account and records of the Partnership shall be audited as of the end of each Fiscal Year of the Partnership by a certified public accountant selected by the General Partner. All matters concerning the valuation of Securities, the allocation of profits, gains and losses among the Partners including the taxes on them and accounting procedures, not specifically and expressly provided for by the terms of the Limited Partnership Agreement, shall be determined in good faith by the General Partner whose determination shall be final, binding and conclusive upon all of the Partners. The General Partner shall have the power to make all tax elections and determinations for the Partnership, and to take any and all action necessary under the Code or other applicable law to effect those elections and determinations. All such elections and determinations by the General Partner shall be final, binding and conclusive upon all Partners.

Case 1:21-cv-00495  ECF No. 1-3, PageID.95  Filed 06/11/21  Page 53 of 57
Case 3:22-mc-00020-L-BH  Document 2-3  Filed 03/18/22  Page 96 of 100  PageID 120

MGMC, LP

### Liabilities

A Limited Partner's capital contribution is subject to the risks of the Partnership's business. However, under the provisions of the Partnership Act, a Limited Partner will not be personally liable for any debts or losses of the Partnership beyond the amount of its capital contribution and profits attributable thereto (if any), plus interest thereon. Each Interest, when issued, will be fully paid and non-assessable. Losses in excess of the Partnership's assets will be the obligation of the General Partner. It should be noted that a Limited Partner would not be able to exercise any management functions with respect to the Partnership's operations. See "RISK FACTORS."

The Limited Partnership Agreement provides that the General Partner shall not be liable, responsible or accountable in damages or otherwise to the Partnership or any of the Limited Partners for any act or omission performed or omitted by it on behalf of the Partnership and in a manner reasonably believed by it to be within the scope of the authority granted to it by the Limited Partnership Agreement, except when such action or failure to act constitutes willful misconduct.

### Indemnification

The Limited Partnership Agreement provides that in any threatened, pending or completed action, suit or proceeding to which the General Partner was or is a party or is threatened to be made a party by reason of the fact that it is or was the General Partner of the Partnership, the Partnership shall indemnify, defend, and hold harmless the General Partner and its "affiliates" (as defined below) from and against any loss, liability, damage, cost, expense (including, without limitation, attorneys' and accountants' fees and expenses incurred in defense of any demands, claims or lawsuits), judgments and amounts paid in settlement (collectively, "Losses"), incurred by them if the General Partner acted in good faith and in a manner it reasonably believed to be in or not opposed to, the best interests of the Partnership and, provided that the omission, act or conduct that was the basis for such Losses was not the result of willful misconduct or gross negligence and was taken or omitted in good faith and in the reasonable belief that it was taken or omitted in, or not opposed to the best interests of the Partnership.

The Partnership may advance funds to the General Partner and its affiliates for legal expenses and other costs incurred as a result of a legal action if the General Partner or its affiliates, as applicable, undertake to repay the advanced funds to the Partnership in cases in which they would not be entitled to indemnification under the Limited Partnership Agreement.

For purposes of indemnification as used in the Limited Partnership Agreement, the term "affiliate" of the General Partner shall mean: (a) any natural person, partnership, corporation, association or other legal entity directly or indirectly owning, controlling or holding with power to vote 10% or more of the outstanding voting securities of the General Partner; (b) any partnership, corporation, association or other legal entity 10% or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote by the

MGMC, LP

General Partner; (c) any natural person, partnership, corporation, association or other legal entity directly or indirectly controlling, controlled by, or under common control with, the General Partner; or (d) any person who is a partner, officer or director of the General Partner.

In the event the Partnership or the General Partner or any of its affiliates is made a party to any claim, dispute or litigation or otherwise incurs any Losses as a result of or in connection with (a) any Partner's (or its assignee's) activities, obligations or liabilities unrelated to the Partnership's business, or (b) any failure or alleged failure on the part of the Partnership or the General Partner to withhold from income allocated or deemed to be allocated to any Partner or its assignees (whether or not distributed) any amounts with respect to which Federal income tax withholding was required or alleged to have been required, such Partner (or its assignees cumulatively) shall indemnify and reimburse the Partnership and the General Partner for all Losses incurred by the Partnership and the General Partner in connection therewith.

### *Termination*

Unless earlier dissolved, the Partnership shall cease doing business on December 31, 2063 and shall thereupon be dissolved. The General Partner, or a liquidating trustee if one is appointed, shall act as liquidating trustee or trustees and immediately proceed to wind-up and terminate the business and affairs of the Partnership and liquidate the property and assets of the Partnership. This person or persons will be made known to the Limited Partners upon request. The Partnership also shall cease doing business and shall be dissolved upon the occurrence of certain other events, including the following:

(a) the expiration of the term of the Partnership on December 31, 2064;

(b) the retirement, insanity, death or bankruptcy of any individual who is a last remaining General Partner or the bankruptcy, retirement or dissolution of any corporation or limited liability company which is the last remaining General Partner unless within ninety (90) days after such event, the Limited Partners owning seventy-five percent (75%) or more of the Percentage Interests owned by all Limited Partners elect by written notice to all Partners to reconstitute the Partnership and continue its business and elect a successor General Partner within such ninety (90) day period;

(c) the determination of the General Partner;

(d) the entry of an order or judgment of dissolution under New Jersey law.

The death, legal disability, incapacity, insolvency, bankruptcy, dissolution or withdrawal of any Limited Partner shall not result in the dissolution or termination of the Partnership.

The Limited Partnership Agreement provides that in the event of the dissolution of or liquidation of the Partnership, its affairs shall be wound up and all assets shall be liquidated as promptly as is consistent with obtaining the fair value thereof and the proceeds therefrom shall be applied and distributed to the payment of all taxes, debts and other obligations of the Partnership and the necessary expenses of liquidation and, if any contingent debt, obligation or

liability exists, a reserve shall be established in such amount as the General Partner deems reasonable and appropriate to satisfy such contingent debt, obligation or liability. Any remaining proceeds shall be distributed to the Partners in accordance with their respective Book Capital Account balances; provided, however, that if the General Partner has a deficit balance in its Capital Account, the General Partner will repay such debit balance either by payment in cash to the Partnership in an amount equal to the debit balance and/or the retention by the Partnership of the General Partner's distributive share of Partnership assets.

### Fiscal Year

The Partnership's fiscal year will end on December 31 of each year.

### Governing Law

Notwithstanding the place where the Limited Partnership Agreement may be executed by any of the parties, the parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the state of Delaware, without regard to principles of conflicts of laws thereof, and, without limitation thereof, that the act as now adopted or as may be hereafter amended shall govern the limited liability company aspects of the Limited Partnership Agreement.

### Miscellaneous Provisions

The Partnership may do business with any person, firm or corporation notwithstanding that such person, firm or corporation is an affiliate (or an affiliate of an affiliate) of any Partner of the Partnership.

The General Partner shall have the right in its sole discretion to decide on behalf of the Partnership whether and to what extent the Partnership will participate in a particular investment, and this decision shall be regardless of the decision made by the General Partner and its related or affiliated entities for its own account, or as trustee, fiduciary or advisor for others.

## PRIVACY POLICY

This privacy policy explains the manner in which the Partnership and the General Partner (collectively, the "Partnership") collect, utilize and maintain nonpublic personal information about the Partnership's investors, as required under recently enacted Federal legislation. This privacy policy only applies to nonpublic information of investors who are individuals (not entities).

### Collection of Investor Information

The Partnership collects personal information about its investors mainly through the following sources:

MGMC, LP

---

❑ Subscription forms, investor questionnaires and other information provided by the investor in writing, in person, by telephone, facsimile, electronic mail or by any other means. This information includes name, address, nationality, tax identification number, and financial and investment qualifications; and

❑ Transactions within the Partnership, including account balances, investments and withdrawals.

### Disclosure of Nonpublic Personal Information

The Partnership does not sell or rent investor information. The Partnership does not disclose nonpublic personal information about its investors to nonaffiliated third parties or to affiliated entities, except as permitted by law. For example, the Partnership may share nonpublic personal information in the following situations:

❑ To service providers in connection with the administration and servicing of the Partnership, which may include attorneys, accountants, auditors and other professionals. The Partnership may also share information in connection with the servicing or processing of Partnership transactions;

❑ To affiliated companies in order to provide you with ongoing personal advice and assistance with respect to the products and services you have purchased through the Partnership and to introduce you to other products and services that may be of value to you;

❑ To respond to a subpoena or court order, judicial process or regulatory authorities;

❑ To protect against fraud, unauthorized transactions (such as money laundering), claims or other liabilities; and

❑ Upon consent of an investor to release such information, including authorization to disclose such information to persons acting in a fiduciary or representative capacity on behalf of the investor.

### Protection of Investor Information

The Partnership's policy is to require that all employees, financial professionals and companies providing services on its behalf keep client information confidential.

The Partnership maintains safeguards that comply with federal standards to protect investor information. The Partnership restricts access to the personal and account information of investors to those employees who need to know that information in the course of their job responsibilities.

Third parties with whom the Partnership shares investor information must agree to follow appropriate standards of security and confidentiality.

---

The Partnership's privacy policy applies to both current and former investors. The Partnership may disclose nonpublic personal information about a former investor to the same extent as for a current investor.

### Changes to Privacy Policy

The Partnership may make changes to its privacy policy in the future. The Partnership will not make any change affecting you without first sending you a revised privacy policy describing the change. In any case, the Partnership will send you a current privacy policy at least once a year as long as you continue to be an investor in the Partnership.